**RHODE ISLAND STUDENT
LOAN AUTHORITY**

v.

**NELS, Inc.**

**No. 88–55–Appeal.**

Supreme Court of Rhode Island.

Dec. 2, 1988.

Joseph R. Palumbo, Jr., Palumbo, Galvin & Boyle, Middletown, for plaintiff.

William T. Murphy, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This controversy was submitted to a Superior Court justice on an agreed statement of facts. The plaintiff is the Rhode Island Student Loan Authority, a governmental entity that was created by the General Assembly at its January 1981 session. P.L. 1981, ch. 44, § 1. This legislation is now known as G.L. 1956 (1988 Reenactment) chapter 62 of title 16. The defendant, NELS, Inc., is a Rhode Island corporation whose principal office at the time in question was situated in the city of Providence. Hereafter we shall refer to the plaintiff as RISLA and to the defendant as NELS.

Since its inception, one of RISLA's paramount functions has been the purchasing of federal and state-guaranteed student loans from Rhode Island banks. These acquisitions provide the lenders with added funds with which to make additional student loans. The 1981 legislation vested RISLA's management in a board of directors that is composed of five individuals who also serve concurrent staggered terms as directors of the Rhode Island Higher Education Assistance Authority (RIHEAA). Each director is appointed by the Governor to serve a five-year term.

RISLA's initial purchase of student loans was funded by its issuance of revenue bonds in the amount of $107,970,000. The bonds, issued on December 1, 1981, were due and payable on January 1, 1985. During this period RISLA entered into contracts with the United States Secretary of Education that would guarantee the entitlement to federal payments for those student loans that met the eligibility criteria.

The 1981 revenue bonds were retired with funds advanced to RISLA by a "federally chartered corporation" known as the Student Loan Marketing Association (SLMA) pursuant to a May 1984 financing agreement in which SLMA agreed to lend and advance to RISLA up to $200 million for the specific purposes of both retiring the 1981 revenue bonds and purchasing. additional student loans from Rhode Island lenders.

RISLA first hired NELS to service its student loans in December 1981. One of the primary functions of NELS was to monitor the students' progress in paying back their loans. The term of the initial 1981 servicing agreement was for thirty-seven months or as long as any portion of the eligible loans required servicing. The thirty-seven-month period coincided with the term of the 1981 revenue bonds. When RISLA entered into the 1984 financing agreement with SLMA, it also entered into a new "Servicing Agreement" with NELS whereby NELS agreed to service student loans acquired by RISLA from various Rhode Island lenders during the fifteen-year term of the May 1984 agreement.

The litigants in this controversy agree that the usual time span from a student's initial receipt of a loan to the loan's final repayment is fifteen years. Many factors contribute to this delay. A student borrower is not required to commence payments until the student has graduated or ceased to be at least a half-time student at a participating educational institution. Upon leaving school, the student is given a grace period during which repayment can be delayed for a period of time from six months to one year. Again, after the grace period has expired, payments may be deferred for a number of reasons, such as the borrower's graduate or professional studies, resumption of undergraduate study, internships, active duty in the armed forces, service in the Peace Corps, full-time volunteer service for a tax-exempt organization, unemployment, rehabilitation training, or temporary disability or the temporary disability of the borrower's spouse.

At the time of the execution of the 1984 servicing agreement the terms of the five directors who executed the agreement would expire within five years. Consequently in February 1986 RISLA, through its counsel, filed this declaratory-judgment action in the Superior Court seeking a declaration that the May 1984 agreement was invalid and void because its fifteen-year term extended beyond the terms of the directors who authorized its execution.

The May 1984 agreement consists of a twenty-eight-page document. NELS's duties, obligations, and functions are set forth in section 5 of the agreement. NELS agreed that each loan would be serviced in "substantial compliance" with procedures set forth in its 1982 operating procedures manual. NELS also agreed to perform a series of duties that are to be found beginning with section 5(a) and ending with section 5(v) of the agreement.

In seeking to nullify the service agreement, RISLA relies upon the common-law principle that holds that any contract made by a governmental authority involving the performance of a governmental function that extends beyond the unexpired terms of the governmental officials executing the contract is void because such an agreement improperly ties the hands of subsequent officials. In contrast, if the contract merely involves a proprietary function of a governmental body, its validity is upheld and may bind successors for as long a period as is necessary to accomplish the contract's goal. *Bair v. Layton City Corp.*, 6 Utah 2d 138, 148, 307 P.2d 895, 902 (1957).

Throughout this litigation NELS has claimed that the servicing of student loans is a proprietary function. RISLA, on the other hand, directs our attention to § 16–62–4(b), which in its pertinent parts provides that "[t]he exercise by the authority of the powers conferred by this chapter shall be deemed and held to be the performance of an essential governmental function of the state for public purposes." The trial justice ruled in NELS's favor and also declared that the 1984 servicing agreement applied only to student loans acquired by RISLA with funds generated by the 1984 financing agreement.

In faulting the trial justice, RISLA places great reliance on the past pronouncements of this court in *Vieira v. Jamestown Bridge Commission*, 91 R.I. 350, 163 A.2d 18 (1960), and *Parent v. Woonsocket Housing Authority*, 87 R.I. 444, 143 A.2d 146 (1958). In these controversies Vieira and Parent were both employed by municipal agencies for terms that exceeded the unexpired terms of the governmental officials who had executed the respective contracts. Vieira had been hired as the bridge commission's general manager for a ten-year term. Parent, an attorney, was engaged as the housing authority's "legal advisor" for a five-year term. Sometime after the contracts were executed, changes in membership occurred in both the bridge commission and the housing authority. Neither Vieira nor Parent was successful in his efforts to nullify his discharge. On each occasion this court relied upon the common-law principle to which we have previously alluded.

We acknowledge the legislative declaration set forth in § 16–62–4(b) and the Legislature's description of the powers

conferred upon RISLA as "[a] performance of an essential governmental function of the state for public purposes." Although courts should give due consideration to a legislative declaration that certain legislation shall be deemed and held to be the performance of a governmental function, such a "self-serving declaration," although it is to be given great deference, is not conclusive as far as the existence of such a "function" is concerned since such a determination is reserved by our State Constitution for the judicial, rather than the legislative, branch of government. *See Advisory Opinion to the Governor,* 113 R.I. 586, 593, 324 A.2d 641, 645–46 (1974); *People ex rel. Scott v. Chicago Park District,* 66 Ill.2d 65, 80, 4 Ill.Dec. 660, 668, 360 N.E.2d 773, 781 (1976). The sole issue before us is whether RISLA should prevail in this dispute because NELS was engaged in a governmental function.

This court, in *Parent v. Woonsocket Housing Authority,* 87 R.I. at 448, 143 A.2d at 148, recognized that a governmental entity can exercise both governmental and proprietary functions. Even though RISLA serves a public purpose and, in doing so, may perform a number of governmental functions, the issue in this dispute is whether NELS's segment of RISLA's operation is governmental or proprietary in nature.[1] The last pronouncement by this court on the distinction between a governmental and proprietary function was *Lepore v. Rhode Island Public Transit Authority,* 524 A.2d 574, 575 (R.I.1987), wherein this court held that in Rhode Island a proprietary function is one " 'not so intertwined with governing that the government is obligated to perform it only by its own agents or employees.' "

After an examination of NELS's duties as set forth in the 1984 servicing agree-

ment, we believe that the particular facet of RISLA's operations that NELS covers is clearly proprietary. NELS was contracted to serve as a rather "sophisticated" collection agency and could neither exercise discretion nor set policy in the performance of its duties. NELS's essential function was to collect the principal and interest on outstanding student loans and to maintain records on all transactions.[2] These functions are proprietary in nature. *See Telford v. Clackamas County Housing Authority,* 710 F.2d 567, 571 (9th Cir. 1983), *cert. denied,* 464 U.S. 1070, 104 S.Ct. 977, 79 L. Ed. 2d 214 (1984). We are of the opinion that that portion of RISLA's operations serviced by NELS is "not so intertwined with governing that the government is obligated to perform it only by its own agents or employees."

Having found that the nature of the services provided by NELS are proprietary, we have only one question remaining, whether the contract binds RISLA for a period of time longer than necessary to accomplish its purposes. *See Bair v. Layton City Corp.,* 6 Utah 2d at 148, 307 P.2d at 902. The servicing agreement with NELS extends no longer than the usual time span for which a student loan is outstanding, and we conclude, therefore, that the contract's duration is no longer than necessary to accomplish its purposes.

It should be noted that provisions have been made for terminating NELS's tenure as the loan servicer. Section 10 of the 1984 servicing agreement calls for the termination of NELS's services by RISLA in the event that (1) NELS's solvency or ability to service the loans is seriously threatened; (2) NELS commits a "material breach" of any of its obligations, representations, or warranties and fails to cure any deficiency

---

1. It should be noted that there are some jurisdictions wherein the governmental-proprietary dichotomy has been rejected. In *Mariano & Assoc. v. Bd. of County Comm'rs of Sublette,* 737 P.2d 323, 327 (Wyo. 1987), the Wyoming Supreme Court found that "no reasoned justification for the governmental-proprietary differential as the dispositive test." In its place, the Wyoming court has adopted the principle that, subject to any applicable statutory prohibition, "any contract with a unit of government of the state of Wyoming which extends beyond the term of office of the governmental decisionmakers * * * can be subject to challenge if, in consideration of the facts and circumstances, the necessity and benefit to the governmental unit did not justify the extended term when the agreement was made." *Id.* at 329.

2. *See* appendix.

within ninety days of receiving notice by RISLA of the deficiency; or (3) provisions are activated calling for the replacement of the servicer pursuant to section 7 B(2) of the May 1984 financing agreement between SLMA and RISLA or paragraph g of the custodian agreement.

Section 7 B(2) of the financing agreement appears to speak to the replacement of NELS by SLMA for a failure to service the loans with the due diligence required by the Secretary of Education and RIHEAA. The section contains no provision that authorizes the replacement of NELS by RISLA. At best, section 7 B(2) might be read as requiring RISLA to obtain prior written approval of SLMA before it could replace NELS as servicer.

The signatories to the custodial agreement were SLMA, RISLA, and NELS. NELS was designated to serve as the custodian for certain documents, all of which relate to students' loans. The documents that were to be entrusted to NELS's care included the students' applications, the original promissory notes, a certificate indicating that the loans were insured, and any further documentation that might be required by the "eligible insured," RIHEAA.

The agreement clearly indicates that NELS's services as custodian be terminated by SLMA for NELS's failure to perform its obligations as custodian. However, if the default was one that did not pose an immediate threat to SLMA's interest in the promissory notes executed in connection with the guaranteed loans, NELS was to be given a reasonable period (no more than sixty days) to cure such a failure. However, the custodial agreement makes it clear that before NELS could be replaced as the loan servicer, any dispute about whether NELS was meeting its obligations as servicer was to be settled by arbitration

in accordance with certain provisions of the financing agreement.

For the reasons stated above, the Superior Court judgment declaring the May 1984 servicing agreement to be valid is affirmed and RISLA's appeal is denied and dismissed.

WEISBERGER, J. did not participate.

MURRAY, Justice, dissenting.

At the outset I emphatically note that this case does not impair any contract obligation owed by RISLA to SLMA, which is, after all, the creditor that provides the funding to purchase student loans. Nor is the underlying collateral in any manner whatsoever impaired.[3] Indeed, RISLA and NELS have stipulated in their agreed statement of facts that RISLA does not question the validity of the underlying debt and obligations owed by RISLA to its creditor, SLMA.[4]

In my view this case centers on the simple question of whether RISLA has the power, pursuant to existing contracts and the underlying statutory scheme, to replace its loan-servicing agent. Said contracts, a financing agreement and a custodian agreement, explicitly provide that RISLA has the power to delegate a different loan servicing agent as long as it obtains the prior written approval of SLMA. *See infra.* It is unfortunate that the majority misreads the RISLA enabling act as providing that the functions of RISLA are proprietary, and not governmental, in view of G.L. 1956 (1981 Reenactment) § 16–62–4(b), as amended by P.L. 1981, ch. 44, § 1 (if majority opinion so holds) and further misreads said enabling act as specifically authorizing contracts in excess of the unexpired terms of the RISLA board of directors. Even if one assumes, *arguendo*, that the board of directors possessed such power, the mem-

---

**3.** SLMA did not ask leave to submit an amicus brief, apparently viewing its interests as adequately protected by its contractual relationship with RISLA.

**4.** The agreed statement of facts, No. 19, provides:

"RISLA has never questioned and does not now question the validity of the Financing Agreement or the Promissory Note. Nor, if the 1984 Servicing Agreement is valid, does RISLA question that it is required to deliver to NELS for servicing student loans purchased with monies advanced pursuant to the Financing Agreement with SLMA, dated May 8, 1984."

bers contracted in a manner that enables them to terminate their relationship with NELS at any time with the acquiescence of SLMA, which point renders the majority opinion an exercise in futility.

I

Long-settled case law in this jurisdiction holds that when a public corporation enters into a contract involving an exercise of a governmental function, such contract is void as against public policy if the contract is for a term in excess of the unexpired terms of the members of the governing body. *Vieira v. Jamestown Bridge Commission*, 91 R.I. 350, 354, 163 A.2d 18, 20–21 (1960); *Parent v. The Woonsocket Housing Authority*, 87 R.I. 444, 143 A.2d 146 (1958). *Parent* held that the aforesaid rule applies to public corporations. 87 R.I. at 448–49, 143 A.2d at 147. RISLA is a public corporation, one to which the rule enunciated in *Vieira* and *Parent* is applicable.

A crucial distinction articulated in both *Vieira* and Parent is the distinction between a function that is governmental in nature andone that is proprietary. A governmental function is generally one that requires an exercise of discretion on the part of an official acting as such. *See Xavier v. Cianci*, 479 A.2d 1179, 1182 (R.I. 1984). As mentioned earlier, contracts involving an exercise of a governmental function are void if they extend beyond the unexpired terms of the members of the governing body because governmental bodies and public corporations may not by contract impair or prevent a succeeding entity from performing such governmental function. *See Parent*, 87 R.I. at 447, 143 A.2d at 147. In contrast, when the function to be performed is proprietary, a governmental body or public corporation may bind its successors for as long a period as is reasonably necessary to accomplish a legal purpose. *Bair v. Layton City Corp.*, 6 Utah 2d 138, 148, 307 P.2d 895, 902 (1957).Proprietary functions do not require an exercise of discretion on the part of a governmental official. By way of illustration, this court has previously held that street sweeping is a proprietary function that may be performed by either the government or a private contractor. *Xavier*, 479 A.2d at 1182.

The General Assembly has conclusively articulated its view on the question of whether the functions performed by RISLA are proprietary or governmental. Section 16–62–4(b) of the RISLA enabling act provides that "[t]he exercise by [RISLA] of the powers conferred by this chapter shall be deemed and held to be the performance of an essential governmental function of the state for public purposes."

In enacting a statute, the Legislature is presumed to know the state of existing relevant law, *State v. Reis*, 430 A.2d 749 (R.I. 1981), including the common law affecting a subject on which legislators undertake to legislate. *Loretta Realty Corp. v. Massachusetts Bonding & Insurance Co.*, 83 R.I. 221, 225–26, 114 A.2d 846, 849 (1955). Where, as here, the language of the statute is plain and unambiguous and expresses a single, definite, and sensible meaning, such meaning is presumed to be the Legislature's intended meaning and the statute must be interpreted literally. *Rhode Island Chamber of Commerce v. Hackett*, 122 R.I. 686, 411 A.2d 300 (1980). NELS purports to construe § 16–62–4(b) to mean merely that money spent by RISLA is to be spent for public purposes and that RISLA is subject to the rules of public corporations. I find the thought that the General Assembly would view it as necessary to stipulate that moneys to be used to purchase student loans must be spent for "public purposes" to be preposterous. The phrase "essential governmental function," when used in legislative draftsmanship, is a term of art. It clearly expresses the intent of the Legislature that acts of RISLA be deemed governmental in nature, not proprietary. To hold otherwise would render § 16–62–4(b) nugatory. "Such an interpretation would run directly counter to the canons of statutory construction, that will not ascribe to the Legislature an intent to enact provisions which are devoid of any purpose or without effect." *State v. Ricci*, 533 A.2d 844, 848 (R.I. 1987). As a result, I would hold the servicing agreement entered into by RISLA and NELS to be void

on grounds of public policy because it purports to bind the hands of succeeding RISLA boards of directors in the performance of an essential governmental function.

## II

The majority holds that the RISLA enabling act expressly authorizes a term of years for the servicing agreement to run that is coextensive with the fifteen-year note issued by RISLA to SLMA. I disagree.

Although the majority cites to several statutes within the RISLA enabling act, its argument, that the fifteen-year contract entered into with RISLA was specifically authorized by statute, appears to rest upon its interpretation of § 16–62–10.[5]

According to the majority, the contract between RISLA and NELS was entered into pursuant to a resolution authorizing the issuance by RISLA of a promissory note to SLMA (the SLMA note). Such resolution could and did permit an agreement with regard to loan servicing, in accordance with § 16–62–10(b). Furthermore, § 16–62–10(c) provides that an agreement made for the security of the SLMA note *shall* continue in effect until the principal and the interest on the note have been fully paid.

This argument is persuasive, up to a point. However, it ignores other provisions contained in the enabling act, namely, § 16–62–4(b) and the language of § 16–62–10(c) itself. Because both provisions contained in the enabling act, namely, § 16–62–4(b) and the language of such a manner that they are in harmony with each other and are consistent in their general scope and purpose. *See Rhode Island State Police Lodge No. 25 v. State,* 485 A.2d 1245 (R.I. 1984). Section 16–62–2 states that the purpose of the RISLA enabling legislation is to authorize a system of financial assistance for qualified residents to enable them to obtain a postsecondary education. The power to substitute one provider of administrative services for another is at best a subsidiary consideration.

As mentioned earlier, § 16–62–4(b) provides that the functions performed by RISLA are deemed to be the performance of an essential governmental function. By enacting § 16–62–4(b), the Legislature has conclusively articulated its intention that the RISLA board of directors not be prevented from exercising discretion in the future.

Even if we assume that the SLMA note was a security for whose benefit a servicing agreement envisioned by § 16–62–10 could be entered into, the ambit of such agreement was circumscribed by the last part of § 16–62–10(c) and by the financing agreement and the contents of the servicing agreement itself. Although § 16–62–10(c) states in part that "each * * * agreement * * * made for the benefit or security of * * * notes of [RISLA] shall continue in effect until the principal of and interest on the * * * notes shall have been fully paid," the sentence continues *"or until provision shall have been made for such payment in the manner provided in the resolution * * *."* (Emphasis added.) The underscored language clearly evinces the legislative intent that

---

**5.** General Laws 1956 (1981 Reenactment) § 16–62–10, as amended by P.L. 1981, ch. 44, § 1, provides in pertinent part:

"Security for bonds and notes.—(a) The principal of and interest on any bonds or notes issued by the authority may be secured by a pledge or assignment of any revenues and receipts of the authority and may be secured by a security interest or other instrument covering all or any part of one or more eligible loans made or acquired by the authority pursuant to the provisions of this chapter.

(b) *The resolution under which the bonds or notes are authorized* to be issued and any such security interest or other instrument *may contain agreements* and provisions *respecting the servicing of the loans covered thereby,* the fix-

ing and collection of payments or repayments or other revenues therefrom, the creation and maintenance of special funds from such revenues and the rights and remedies available in the event of default, all as the authority shall deem advisable.

(c) *Each* pledge, assignment, *agreement,* security interest or other instrument *made for the benefit or security of any of the* bonds or *notes of the authority shall continue in effect until the principal of and interest on the* bonds or *notes* for the benefit of which the same was made *shall have been fully paid, or until provision shall have been made for such payment in the manner provided in the resolution* under which such bonds or notes were authorized." (Emphasis added.)

agreements made for the benefit of notes or bonds continue until other provisions have been made for payment. Thus the language of the statute recognizes the possibility that a substitution of service providers might occur. Additionally, the financing agreement entered into between SLMA and RISLA and the servicing agreement to which NELS was a party both explicitly provide that RISLA has the power to contract with a service provider other than NELS, as required by said financing agreement.[6] In other words, the servicing agreement that is the subject of this dispute is for the benefit of the SLMA note, not for NELS. As a result, RISLA is free to contract with another service provider at any time, as long as it complies with section 7 B(2) of the financing agreement with SLMA. Because RISLA is free under the terms of the financing agreement to replace NELS, it is all the more regrettable that the majority felt itself constrained to reach the conclusion that it did. My conclusion would harmonize the language contained in both parts of § 16–62–10(c), and it would harmonize § 16–62–10 with § 16–62–4(b). Furthermore my construction of both of the aforementioned provisions accords with the purpose of the RISLA enabling act, as set forth in § 16–62–2. Finally my conclusion effectuates the intent of the parties as manifested in the servicing agreement, which specifically provides a mechanism for the replacement of NELS as service provider.

As a result of the foregoing, I would reverse the judgment of the trial court insofar as it held the servicing agreement to be valid.

### APPENDIX

*Summary of NELS's Servicing Agreement Duties*

a. Maintain a file on each loan sufficient to allow separate identification of each loan securing the bonds.

b. Maintain insurance or guarantee coverage on each loan.

c. Allow forbearance on loans only in accordance with RISLA's forbearance policy.

d. Exercise due diligence in servicing the loans.

e. Collect all payments of principal and interest and deposit them (net of servicing fees) with the trustee (Fleet National Bank) in the final account pursuant to the custodian agreement, the trust agreement, and the financing agreement within five days of collection.

f. Provide RISLA with a written statement indicating the amount billed for interest, subsidy payments, and special allowance payments.

g. Be responsible, if discrepancies or disputes arise with respect to amounts billed and/or received, for representing the interest of RISLA in effecting a settlement with the Secretary of Education—but any settlement must be approved by a duly authorized officer of RISLA.

h. Mail a statement to Fleet National Bank ten days after each deposit indicating the amount of principal and interest deposited.

i. Retain summary records of all collection contracts and of changes for which records are required.

j. Prepare and maintain appropriate accounting records with respect to all transactions relating to each loan.

k. Handle processing of all adjustments and address changes.

l. Take all necessary steps, when default occurs, to file and prove a claim for loss with the guarantee agency (RIHEAA) and assume responsibility

---

6. The financing agreement, section 7 B(2), provides in pertinent part: "With the prior written approval of [SLMA], the borrower [RISLA] may delegate to another, upon terms satisfactory to [SLMA], the functions of administering, servicing, collecting and maintaining appropriate books and records for such Insured loans."

Furthermore, the very servicing agreement that NELS seeks to enforce for a term of fifteen years contains a provision establishing a mechanism for its replacement as servicer of said loans, pursuant to section 7 B(2) of the financing agreement. *See* servicing agreement § 10(iv).

for all communications with the guarantee agency as required to accomplish recovery.

m. Take all actions necessary when a claim for loss is denied by the guarantee agency to allow RISLA to cause the lender to repurchase the loan or substitute a new one therefor.

n. Prepare and file with the guarantee agency a lender's manifest on all new accounts, accounts paid in full, and accounts converted to a repayment basis.

o. Prepare and make available to RISLA and Fleet National Bank by the fifteenth of each month the following reports:

(1) Unaudited summary statement of all transactions of the preceding month

(2) Report showing unpaid principal at end of the preceding month

(3) Delinquency report for the preceding month showing all past-due accounts

(4) Report of loans paid in full for the preceding month

(5) Report of amount of unpaid principal on defaulted loans

(6) Copies of all formal reports filed or made by NELS

p. Maintain duplicate files on all loans at a separate location.

q. Maintain in a fireproof vault the original promissory notes to each loan.

r. Maintain insurance for loss or damage to the files and NELS shall be liable for costs or loss resulting from reconstruction of data in the event of a computer malfunction.

s. Maintain fidelity bonds upon all of its personnel.

t. Answer all reasonable inquiries from interested parties and resolve or notify RISLA of complaints within a reasonable time.

u. Provide services to RISLA to enable it to comply with the financing agreement and all other obligations of NELS or RISLA pursuant to the custodian agreement or trust agreement.