**Eliott IZEN, assignee of Crystal Craft, Inc.**

v.

**James WINOKER et al.**

**No. 89–554–Appeal.**

Supreme Court of Rhode Island.

April 11, 1991.

John D. Deacon, Providence, for plaintiff.

Dennis J. Roberts, II, Roberts, Carroll, Feldstein & Peirce, Inc., and Michael P. DeFanti, Hinckley, Allen, Snyder & Comen, Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on cross-appeals by Eliott Izen, assignee of Crystal

Craft, Inc. (plaintiff) and James R. Winoker and Marilyn Winoker (defendants). Both parties appeal from a judgment entered in the Superior Court wherein the plaintiff was awarded the sum of $600,000 in compensatory damages in respect to counts 1 and 2 of the plaintiff's complaint. In respect to this award, the trial justice denied a motion for new trial. In count 6 of the complaint, the plaintiff had sought punitive damages. In a separate hearing the trial justice granted the defendants' motion for a directed verdict in respect to the punitive-damage claim. During the pendency of this action Crystal Craft became insolvent, and a receiver was appointed. The receiver assigned Crystal Craft's claim against the defendants to Eliott Izen, the president and sole shareholder of Crystal Craft. For purposes of this opinion the term "plaintiff" will refer collectively to Crystal Craft and Eliott Izen. We affirm. The facts of the case insofar as pertinent to these appeals are as follows.

The plaintiff was engaged in the manufacture of point-of-sale display cases used mainly in the jewelry industry. This business had been carried on in the Stillwater Mill Complex (Stillwater) in Smithfield, Rhode Island. The plaintiff owned this mill complex from 1978 until 1983. On January 21, 1983, plaintiff and defendants entered into an agreement for the sale of Stillwater to defendants or their nominee. The agreement provided that plaintiff would have the privilege of remaining on the property for three months and thereafter for an indefinite term as a month-to-month tenant. One of the provisions of the sales agreement set forth in paragraph 17 is of particular importance in this litigation and reads as follows:

"[T]he Seller will keep the rented premises in good order and repair and will make no alterations or improvements to the same; the Seller will maintain general comprehensive public liability insurance insuring the Seller and the Buyer against liability for property damage or personal injury in the amount of not less than $500,000 (combined single limit); the Seller will supply the Buyer with evidence of the comprehensive public liability insur-

ance; the Seller will indemnify the Buyer from all loss, cost or damage sustained by the Buyer on account of damage to property or injury to persons resulting from any accident or other occurrence on or about the rented premises; property of the Seller will be kept on the rented premises at the Seller's risk."

At the time of the sale the several buildings of Stillwater were protected by an automatic sprinkler system that was powered by a large pump in a building designated as building No. 2. This pump drew water from a pond located on the premises and known as Stillwater Pond. The water was distributed through the pump to a series of pipes running underground between the buildings and ultimately to an overhead sprinkler system in each of the seven buildings of the complex. The plaintiff occupied building No. 1, which was the largest building in the complex. A fire in any building would cause the nearest sprinkler head to spray water in the vicinity of the fire. A larger fire would trigger activity on the part of additional sprinkler heads located throughout the area. The fire pump and a smaller jockey pump would maintain water pressure within the system and would switch on automatically after the opening of one or more sprinkler heads. Further, the water flowing through the system would activate an electronic alarm connected to the town fire station.

In December of 1983, the sprinkler system, at least on an automatic basis, became inoperative probably because of one or more leaks in the underground piping system. These leaks caused the pressure in the system to be reduced to zero. This condition was reported to Gerald McCarthy (McCarthy), who handled maintenance and repairs at various properties owned by defendants. Evidence indicated that McCarthy, on behalf of defendants, promised to see to it that repairs were performed.

The condition of the system was further exacerbated in January of 1984 when some pipes and the jockey pump in the pumproom (building No. 2) froze during a period of frigid weather. The plaintiff discussed this condition with McCarthy, who again

promised to effectuate the necessary repairs. McCarthy and/or James Winoker procured an estimate of the cost of repairing the piping and jockey pump in the sum of $3,450. This estimate was submitted to Aetna Insurance Company (defendants' insurer), which responded by saying that the cost of repairing the underground pipes was not covered by defendants' policy, but it did pay defendants $2,450, which covered the repair of the damage to the pipes and jockey pump minus a deductible of $1,000. However, defendants at that time paid for only $360 worth of repair to the piping in the pumproom.

On May 17, 1984, a fire of undetermined origin occurred on the premises occupied by plaintiff. Employees of plaintiff attempted to extinguish the fire by using hand-carried fire extinguishers. The sprinkler system responded briefly, but pressure was exhausted in less than twenty seconds. The fire had started in an area where unassembled cardboard boxes and wooden pallets were stored, and the flames soon advanced to a point beyond the ability of the employees to control. The fire department was summoned. The employees who fought the fire were forced to evacuate the building after about twenty minutes of seeking to contain the blaze. By the time the town fire department arrived at the scene, the main building was engulfed in flame, and all plaintiff's machinery, equipment, and inventory was destroyed.

Both parties raise issues in support of their respective appeals. In essence, defendants assert that the trial justice should have directed a verdict in their favor on the issue of compensatory damages or in the alternative should have granted their motion for a new trial after the award of compensatory damages. The plaintiff asserts that the trial justice erred in declining to submit the question of punitive damages to the jury. These issues will be dealt with in the order of their significance to this opinion. Further facts will be supplied as needed to provide a framework for consideration of the issues.

I

COMPENSATORY DAMAGES

A

The Motion for Directed Verdict

■ The defendants argue that the trial justice should have directed a verdict in respect to counts 1 and 2, which essentially allege that defendants were negligent in failing to maintain the automatic sprinkler system so that it would respond in the event of fire. The defendants argue that paragraph 17 of the sales agreement provides, as part of an arm's-length transaction, that plaintiff agreed to absolve defendants from any obligation to protect plaintiff or its property that was maintained in the rented premises. The plaintiff argues that the sprinkler system and its underground piping system constituted a portion of the premises retained by defendants and, therefore, were not controlled by paragraph 17 of the sales agreement. The plaintiff and the defendants cite *Gormley v. Vartian,* 121 R.I. 770, 403 A.2d 256 (1979), for the principle that a landlord must maintain retained portions of the leased or rented premises in a reasonably safe condition for the benefit of his or her tenants. With this proposition we are in general agreement. It is a familiar and well-settled doctrine in this jurisdiction that a trial justice, when considering a motion for directed verdict, must examine the evidence in a light most favorable to the plaintiff without evaluating it for credibility and drawing all reasonable inferences in favor of that plaintiff. It is only when the evidence and inferences drawn therefrom are such that a verdict in favor of the plaintiff could not be supported that the motion for direction should be granted. *See, e.g., Lamoureux v. Davis,* 504 A.2d 449 (R.I. 1986); *Haxton's of Riverside, Inc. v. Windmill Realty, Inc.,* 488 A.2d 723 (R.I.1985). In reviewing the trial justice's decision on a motion for directed verdict, this court must apply the same standard. *Souza v. Narragansett Council, Boy Scouts of America,* 488 A.2d 713 (R.I.1985).

■ Applying this standard to the evidence in the case, we are of the opinion that this evidence would have supported a finding that the automatic sprinkler system, together with its pumps and underground piping, was not confined to the leased premises and was part of the retained facilities under the control of the landlord. This view is substantiated by evidence that both McCarthy and Winoker undertook the obligation to make repairs to the system, including submitting a claim to defendants' insurer to assist in defraying the cost of these repairs.

■ We have recognized the doctrine that one who assumes a duty to perform an act must do so with reasonable care whether or not that person had an obligation to perform the act or repairs prior to assuming the duty. *See Therrien v. First National Stores, Inc.,* 63 R.I. 44, 51, 6 A.2d 731, 734 (1939) (citing Cardozo, C.J. in *H.R. Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, 167, 159 N.E. 896, 898 (1928)). Consequently whether, pursuant to paragraph 17 of the sales agreement, defendants might have refused to make repairs to the automatic sprinkler system upon learning of the break, the evidence indicates that McCarthy—on defendants' behalf—agreed to make the repairs. There is also evidence to indicate that Winoker obtained various estimates and apparently exercised the option to wait before effectuating the repairs until he had considered, among other alternatives, tying the sprinkler system into the town water system so that pumps would be unnecessary. Certainly a jury could have reasonably found that defendants' taking no action to repair the sprinkler system between December 1983 and May 1984, in spite of knowing the nature of plaintiff's business, constituted lack of due and reasonable care.

■ In respect to proximate cause, evidence tended to show that an operative sprinkler system would have contained the fire to the area in which it had started and would have allowed the town fire department to extinguish the blaze with minimal damage. Although defendants cite instances of violation of the Occupational Safety and Health Act (OSHA) by plaintiff, there was also evidence that in each instance plaintiff complied with the OSHA recommendations. There is also no evidence concerning the cause of the fire, nor is there evidence that any specific violation of due care by plaintiff's employees caused the fire.

■ The defendants also argue that the automatic sprinkler system could have been manually operated. There was some expert testimony concerning the manner in which such manual operation could have been accomplished. Certain switches would have been required to be opened and possibly a checkvalve as well. In any event, a rational jury could well have found that plaintiff's employees and plaintiff itself had not been instructed in manual operation since at all times when plaintiff was in control of the premises the sprinkler system operated in the automatic mode. Under the directed-verdict standard such a failure by defendants to instruct plaintiff, in light of the prior malfunction of the automatic system, could have been construed as negligence.

Consequently the trial justice did not err in declining to direct a verdict in favor of defendants on the counts alleging negligence.

B

Motion for New Trial

■ In evaluating the motion for new trial in respect to the claim for compensatory damages, the duty of the trial justice is significantly different from that in respect to a motion for directed verdict. On the motion for new trial the trial justice must evaluate the evidence in the light of his or her charge to the jury and exercise his or her independent judgment regarding the weight of the evidence and the credibility of the witnesses. In so doing, he or she assumes the role of a super juror and, having done so, should set the verdict aside when in his or her judgment it is clearly wrong because it fails to respond truly to the merits of the controversy, fails to administer substantial justice, and is against

the fair weight of the evidence. By the same token the trial justice should allow the verdict to stand if the evidence is evenly balanced or is such that different minds could fairly come to different conclusions. *Lariviere v. Dayton Safety Ladder Co.*, 525 A.2d 892, 899 (R.I.1987); *Gardiner v. Schobel*, 521 A.2d 1011, 1015 (R.I.1987); *Barbato v. Epstein*, 97 R.I. 191, 193–94, 196 A.2d 836, 837 (1964). When a trial justice has performed the function set forth above, his or her decision will be accorded great weight and will only be disturbed if it can be shown that the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong. *Lariviere*, 525 A.2d at 900.

In the case at bar the trial justice did review the evidence and expressed some doubt about the jury's conclusions in regard to the liability of defendants and the issue of comparative negligence. In effect he determined that reasonable minds might fairly come to different conclusions, based upon his charge to the jury. We cannot say that the trial justice was clearly wrong in so concluding. We have already indicated that as a matter of law paragraph 17 of the sales agreement did not absolve defendants from liability for failing to effectuate repairs to the automatic sprinkler system. Consequently a finding of liability for failure to effectuate such repairs by the jury could not lightly be set aside.

■ In respect to the issue of comparative negligence, although the trial justice indicated that he thought in his independent judgment that there was some comparative negligence, he was correct in declining to disturb the jury's verdict on this issue. There was no direct evidence concerning the cause of the fire. Also there was conflicting evidence on whether manual operation of the sprinkler system should have been within the capability of plaintiff's employees, particularly in the emergency situation with which they were faced. The jury verdict that placed sole liability upon defendants, was supported by the evidence. The trial justice neither overlooked nor misconceived material and relevant evidence. He was not clearly wrong

in declining to disturb the verdict on compensatory damages. Therefore, he did not err in declining to grant defendants' motion for a new trial.

## II

### PUNITIVE DAMAGES

■ The plaintiff argues that there was sufficient evidence presented to preclude the trial justice from directing a verdict against plaintiff on this issue. We have already stated the standard for directing a verdict. This standard requires that the trial justice view the evidence in the light most favorable to the nonmoving party and draw all reasonable favorable inferences therefrom. Under this standard it was the duty of the trial justice to determine from the evidence of failure to repair the underground pipes and pumps connected with the sprinkler system, an element of willfulness, recklessness, or wickedness on the part of the party at fault so as to amount to criminality. *Morin v. Aetna Casualty & Surety Co.*, 478 A.2d 964, 967 (R.I.1984); *Sherman v. McDermott*, 114 R.I. 107, 109, 329 A.2d 195, 196 (1974). The trial justice, in analyzing the evidence, concluded that although the failure to repair the system within a reasonable time could well constitute negligence, it did not amount to the necessary willfulness, malice, or criminality required by the punitive-damages standard. The evidence indicated that Winoker and McCarthy were examining the alternatives and intended to repair the damaged system in the most effective way. It is true that a memo from Armand Carlino dated May 2, 1984, warned defendants that conditions at the Crystal Craft plant were negatively affected by the lack of an automatic sprinkler system. Nevertheless, there was no indication that defendants' conduct was willful or malicious. They were, as the trial justice indicated, working on the problem, albeit not with the promptness the situation required.

We conclude, as did the trial justice, that this conduct did not amount to the criminality required by our prior cases. This conclusion would not be affected by the evidence introduced to show that the defen-

dants were adequately insured in the event of destruction of the complex buildings by fire. This was not a willful tort such as the assault as in *Sherman, supra;* the fraudulent transfer as in *Greater Providence Deposit Corp. v. Jenison,* 485 A.2d 1242 (R.I.1984); or the libel in *Healey v. New England Newspapers, Inc.,* 555 A.2d 321 (R.I.1989). Cases cited from other jurisdictions are distinguishable and in some instances not persuasive on the issue of punitive damages. The trial justice did not err in directing a verdict in favor of the defendants on this issue.

For the reasons stated, the appeals of both parties are denied and dismissed. The judgment entered by the Superior Court is affirmed. The papers in the case may be remanded to the Superior Court.