Gisele **CINQ–MARS**

v.

Pablo **RODRIGUEZ, M. D.**

No. 94–160–Appeal.

Supreme Court of Rhode Island.

April 22, 1996.

Robert Corrente, Providence and Jeffrey S. Brenner, Cherry Hill, NJ, for Plaintiff.

David W. Carroll, Providence, for Defendant.

## OPINION

WEISBERGER, Chief Justice.

This case comes to us on appeal by the defendant Pablo Rodriguez, M.D. (Dr. Rodri-

guez), from a judgment in Providence County Superior Court in favor of the plaintiff based on her action for negligence and removal of her left ovary without obtaining her informed consent. At the conclusion of the evidence the defendant moved for a directed verdict on the informed-consent count, which motion was denied by the trial justice. After the jury returned a verdict for the plaintiff on both the negligence and the informed-consent counts, the defendant moved for a new trial. The trial justice denied the motion. The defendant filed a timely appeal from these rulings with this court on November 15, 1993. The plaintiff, Gisele Cinq–Mars (Cinq–Mars), conditionally appeals certain rulings made by the trial justice and claims error in the jury instructions. For the reasons stated herein, we deny and dismiss the defendant's appeal from the judgment. We do not reach the plaintiff's conditional appeal. The facts of the case insofar as pertinent to the defendant's appeal are as follows.

In November of 1985 Cinq–Mars contacted the Rhode Island Group Health Associates (RIGHA), complaining of abdominal pain on her left side. She was given an appointment with Dr. Rodriguez on November 13, 1985. At that visit defendant examined plaintiff and ordered a sonogram. His written clinical impression based on that visit was that plaintiff had a possible fibroid uterus. The plaintiff had a second appointment with defendant on December 2, 1985. During that visit defendant informed her that the sonogram revealed a mass on the left side. The defendant's notes from this visit indicate that he informed plaintiff that the mass could be an endometrioma, a follicular cyst, a benign ovarian tumor, or ovarian cancer. His notes also indicate that he planned a "laparoscopy, a possible laparotomy, and a possible ovarian cystectomy" for plaintiff.

At trial the jury heard conflicting testimony respecting defendant's discussion of the risks and complications of the laparoscopy with plaintiff. The plaintiff testified that in the process of obtaining her consent for surgery, defendant told her that a laparotomy might be needed in addition to the laparoscopy but that he did not advise her that she might need additional procedures. The de-

fendant testified that he discussed the risks of surgery with the plaintiff, as was his usual custom and practice, but could not recall which risks were specifically discussed. While reviewing his notes from the appointment, defendant said that based on his usual custom and practice, he would have discussed the possibility of a complete hysterectomy and removal of both ovaries in the event that he found cancer in plaintiff's abdomen during surgery. He testified that he would have also discussed with plaintiff other risks of surgery, including infection, bleeding, and risks concomitant to anesthesia. The defendant gave conflicting testimony on cross-examination, however, stating that "I discussed with Gisele the probability that I would have to remove an ovary * * * [and] that I would have to remove the uterus if I found disseminating cancer."

At the end of the December 2, 1985 appointment, plaintiff signed a consent form on which the only procedure listed was laparoscopy. The consent form included the following general paragraph: "I understand that the above as well as other complications sometimes require additional procedures or operations. I consent to such additional procedures if my physician feels they are necessary." The plaintiff testified, however, that defendant did not inform her that other procedures, in addition to the laparoscopy and the laparotomy, might be required, nor did he discuss with her any of the possible complications of those procedures.

On January 3, 1986, plaintiff had a third office visit with defendant. She testified that defendant told her that he felt she might have a benign tumor that might need to be drained. She said he told her that if the tumor could not be drained, he planned to do a laparotomy and remove the tumor. She testified that defendant did not discuss any other contingencies or procedures with her, including cystectomy, removal of the ovary or tube, hysterectomy, or other procedures that might be warranted if he discovered cancer in plaintiff's abdomen during surgery. She said he did not discuss any of the risks of the surgery with her during this visit, including infertility, sterility, or loss of ovarian function.

On January 30, 1986, the day of the surgery, plaintiff was informed by a nurse that the consent form for surgery that she had signed at the December 2, 1985 visit was the "wrong" form because it did not include laparotomy in the list of possible procedures. The defendant testified that he told plaintiff that his secretary "forgot to type the rest of the procedure[s]" but that he would add it and initial the form. He said that he then gave the form to plaintiff for her to initial. The plaintiff testified that defendant asked her to initial the form but that she did not see him write anything on it. The consent form carries defendant's initials on the front and plaintiff's signature on the back, but plaintiff's initials do not appear on the front of the form.

The plaintiff testified that at this visit defendant did not advise her about any other possible procedures, alternative procedures, or risks of surgery. The plaintiff said that she would not have consented to the surgery if defendant had informed her that, as a result of the surgery, she might be rendered sterile or infertile or lose ovarian function. In fact, prior to surgery neither plaintiff nor defendant knew that plaintiff did not have a right ovary.

At trial, defendant testified that his dictated notes of the surgery indicated that after making an incision into plaintiff's abdominal cavity, "a large, left ovarian endometrioma was found which involved the entire substance of the ovary." The defendant said that he subsequently removed plaintiff's left ovary and fallopian tube without checking to see if plaintiff's right ovary was intact. He testified that he did not remember why he did not examine the right side of plaintiff's abdomen before removing the left ovary. The defendant said that he had been trained to inspect the entire pelvic cavity before removing any tissue from it. He stated in his deposition that he did not know why he did not inspect the entire pelvic cavity first, adding: "I don't remember. Maybe I forgot." The plaintiff testified that during her first visit she informed defendant that she had previously undergone surgery on her right ovary to remove a ruptured ovarian cyst during an emergency procedure to remove her appendix. The plaintiff said that she told defendant that this procedure had been done by a general surgeon, and that the surgeon had removed a quarter of her right ovary. The defendant testified that when plaintiff told him that the previous surgery had been performed by a general surgeon, he was concerned that a general surgeon would be less able to perform the surgery properly than would a gynecologist. He said that he also knew that it was possible for an ovary to degenerate or to disintegrate after surgery, particularly if the procedure had not been performed competently. The plaintiff testified that she asked defendant if he needed the report from this surgery, but he told her that he did not need it. The plaintiff's expert witness, William Sweeney, M.D. (Dr. Sweeney), testified that defendant deviated from the standard of care by failing to inspect the right ovary before removing the left ovary and fallopian tube, as did two of defendant's expert witnesses. Doctor Sweeney also testified that defendant deviated from the standard of care by not trying to drain the tumor before removing it.

The jury also heard conflicting testimony regarding the issue of causation. Doctor Sweeney testified that prior to surgery plaintiff was having monthly periods and that she was ovulatory and fertile and that defendant's deviation from the accepted standard of care was the direct cause of plaintiff's post-surgical infertility and loss of hormone function. The defendant testified, however, that on the basis of his examination on the day of the surgery, plaintiff's left ovary was not capable of egg release that would lead to pregnancy. Stuart Lauchlan, M.D. (Dr. Lauchlan), defendant's expert, testified that he had examined plaintiff's removed left ovary and said that on the basis of his examination he felt that the left ovary had not released eggs for at least six months prior to surgery and that it would have been incapable of releasing eggs in the future. Another of defendant's experts, Mary Jane Minkin, M.D. (Dr. Minkin), testified that the fact that plaintiff had recent menstrual periods indicated that the left ovary was still producing estrogen but did not mean that the ovary was releasing eggs.

In support of his appeal defendant raises two issues. Further facts will be supplied as necessary to discuss the issues.

## I

### The Motion for a Directed Verdict on the Informed–Consent Count

The defendant argues that the trial justice's denial of his motion for a directed verdict on the lack-of-informed-consent count was error. He contends that he was obligated to disclose only material risks of the surgery and that plaintiff did not establish that sterility was a material risk of surgery involving one ovary. He claims that sterility resulted because plaintiff did not have a right ovary and that removal of the left ovary became surgically necessary. The defendant also contends that plaintiff's assertion that had she been informed that she could be infertile and sterile or lose hormone function as a result of the surgery, she would not have consented to it even if she had known there was a possibility that the tumor was malignant, was unreasonable. He therefore claims that he was entitled to a directed verdict as a matter of law.

■ When reviewing the decision of a trial justice on a motion for a directed verdict, this court is bound by the standard of review that must be followed by the trial justice. *Young v. Park*, 417 A.2d 889, 893 (R.I.1980). In considering a motion for directed verdict, the trial justice must view the evidence in the light most favorable to the party opposing the motion and draw all reasonable favorable inferences therefrom without weighing the evidence or considering the credibility of the witnesses. *Vaz v. Bastien*, 599 A.2d 1363, 1364 (R.I.1991). If the evidence viewed in this light would justify a reasonable jury's finding for the plaintiff, the jury is entitled to decide the facts and the motion should be denied. *Rodrigues v. Miriam Hospital*, 623 A.2d 456, 460 (R.I.1993). If, however, after this analysis of the evidence, the trial justice concludes that no reasonable jury could find for the plaintiff, the motion should be granted. *Izen v. Winoker*, 589 A.2d 824, 827 (R.I.1991).

■ Applying this same standard, we are of the opinion that in the instant case the trial justice did not err in denying the motion for directed verdict on the issue of informed consent. The trial justice determined that the evidence on the issue of informed consent raised a question for the jury. Viewing the evidence in the light most favorable to plaintiff without weighing the evidence, without considering the credibility of the witnesses, and drawing all reasonable inferences therefrom, we are of the opinion that a reasonable jury could well determine that plaintiff had not given informed consent to the removal of her left ovary. We conclude that the trial justice's denial of the motion for a directed verdict on that issue was proper.

## II

### The Motion for a New Trial

The defendant next challenges the denial of his motion for a new trial, claiming that the trial justice overlooked material evidence that he was not negligent in treating plaintiff. He contends that in denying the motion, the trial justice failed to mention the testimony of one of defendant's experts, Dr. Lauchlan, who examined plaintiff's left ovary after surgery and determined that it had not released eggs for six months to a year prior to surgery and that it would not have been capable of releasing eggs in the future. The defendant argues that in her denial of his motion for a new trial, the trial justice should also have addressed Dr. Lauchlan's testimony that on the basis of his examination of the tissue removed from plaintiff, he believed that it would have been impossible for defendant to remove the cyst without completely removing the left ovary. The defendant also argues that the trial justice should have discussed the testimony of another of defendant's witnesses, Andrew Blazar, M.D., who testified that defendant's medical treatment of plaintiff met the standard of care required of physicians in Rhode Island. The defendant further contends that in her denial of the motion for a new trial, the trial justice's comment on the testimony of another of defendant's expert witnesses, Dr. Minkin, to the effect that she had made "a couple of

comments that did not reflect well upon * * * defendant" was exceptionally broad.

When reviewing a decision of a trial justice on a motion for a new trial, it is well settled that "his or her decision will be accorded great weight and will only be disturbed if it can be shown that the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." *Izen,* 589 A.2d at 829. We have stated that in considering a motion for a new trial,

> "the trial justice must evaluate the evidence in the light of his or her charge to the jury and exercise his or her independent judgment regarding the weight of the evidence and the credibility of the witnesses. In so doing, he or she assumes the role of a super juror and, having done so, should set the verdict aside when in his or her judgment it is clearly wrong because it fails to respond truly to the merits of the controversy, fails to administer substantial justice, and is against the fair weight of the evidence. By the same token the trial justice should allow the verdict to stand *if the evidence is evenly balanced* or is such that different minds could fairly come to different conclusions." *Id.* at 828–29.

We are of the opinion that in the instant case, the trial justice was not clearly wrong in denying the motion for a new trial in light of conflicting evidence concerning negligence. We have also stated that in passing on a motion for a new trial, the trial justice need not give an exhaustive survey of the evidence, "but reference must be made to the evidence upon which the fate of the motion is decided." *Belanger v. Cross,* 488 A.2d 410, 413 (R.I.1985). Implicit in the trial justice's decision is an acceptance of the testimony of certain witnesses and rejection of the testimony of certain other witnesses. In this instance the trial justice relied heavily on the testimony of Dr. Sweeney that defendant's negligence was the direct cause of plaintiff's sterility and loss of ovarian hormonal function. We conclude that in so doing, the trial justice did not err.

The defendant also contends that the trial justice erred in denying the defendant's motion for a new trial by overlooking or misconceiving material evidence on the issue of informed consent. Applying the foregoing standard, we are of the opinion that the trial justice did not err in denying the motion for a new trial on the basis of her finding that the testimony at trial was sufficient to support the jury's finding on the issue of informed consent. With respect to informed consent, the trial justice again relied on the testimony of Dr. Sweeney. We conclude that she did not err in so doing.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of the Superior Court is affirmed. In light of our determination of the issues in respect to the motions for a directed verdict and a new trial, we conclude that it is unnecessary for us to reach the issues raised by the plaintiff in her conditional appeal. The papers in the case may be remanded to the Superior Court.

FLANDERS, J., did not participate.