John P. GRAFF

v.

Francis T. MOTTA et al.

No. 94–744–Appeal.

Supreme Court of Rhode Island.

June 10, 1997.

Kevin McAllister, Providence, for Plaintiff.

Lauren E. Jones, Marc DeSisto Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

BOURCIER, Justice.

These are appeals by the city of Warwick and one of its police officers from final judgment entered against them in the Superior Court following jury verdicts for the plaintiff. The plaintiff also appeals from the final judgment reflecting the rejection by the jury of his claim for violation of civil rights pursuant to 42 U.S.C. § 1983 and also the failure of the judgment to provide for the joint and several liability of the defendants.

The plaintiff is John P. Graff (Graff), and the defendants are the city of Warwick (city) and William DeFeo (Captain DeFeo), a captain in the Warwick police department. On April 24, 1990, Graff commenced a civil action in the Superior Court against the city and a John Doe designated defendant, seeking both compensatory as well as punitive damages for malicious prosecution (count 1), abuse of process (count 2), violation of civil rights—42 U.S.C. § 1983 (count 3), and false arrest (count 4). Later, on April 10, 1992, Graff amended his complaint by substituting the defendant Captain DeFeo for the previously designated John Doe defendant. His complaint remained otherwise unchanged.

# I

## Facts and Travel

Graff's complaint had its origins in an incident that occurred in the early morning hours of June 1, 1987. On that date, while Graff was operating his 1980 Harley Davidson motorcycle on West Shore Road in Warwick, Officer Charles R. Blackmar, Jr. (Officer Blackmar), a Warwick police officer, observed the motorcycle traveling approximately fifty-five miles per hour in an area designated a thirty-five-mile-per-hour zone. Officer Blackmar also noticed that in addition to exceeding the speed limit, the motorcycle was lacking a taillight. Officer Blackmar exited the parking lot in which he had been parked and began following the motorcycle. While Officer Blackmar was pursuing the motorcycle, it accelerated to approximately seventy-five to eighty miles per hour. While traveling at that high rate of speed, the motorcycle had to negotiate two difficult curves in the road. When Officer Blackmar came around the second curve, he noticed that the motorcycle had just been involved in a head-on collision with another motor vehicle.

As he approached the scene of the collision, Officer Blackmar found a body, later identified as the plaintiff Graff, approximately fifteen to twenty feet from the motorcycle. Graff had sustained what appeared to be life-threatening injuries. An ambulance was called, and Graff was eventually taken to Rhode Island Hospital where he remained for some two months and underwent three rounds of surgery. As a result of the medical treatment he received, Graff survived the collision.

The operator of the car that was involved in the collision with Graff's motorcycle, Brian D. Fontaine (Fontaine), gave a statement to the police soon after the incident. In that statement Fontaine explained that as he was driving on West Shore Road, he observed Graff's motorcycle traveling toward him in his lane of travel at a high rate of speed. Fontaine was unable to maneuver his car to avoid the motorcycle before impact. Fontaine's witness statement, along with the police report written by Officer Blackmar, a criminal complaint, a police summons, and an unsigned affidavit were all made part of the Warwick police record maintained on the June 1, 1987 collision. The summons, which charged Graff with eluding a police officer, was not issued to Graff immediately after the accident, however, because it was not clear whether Graff would survive. Because Graff's future was uncertain, the entire police record of the incident was put aside.

Graff's recollection regarding the events of the collision on June 1, 1987, differed, however, from that of Fontaine and of Officer Blackmar. Graff contended that he was forced to cross the center line of the road when a police officer's cruiser suddenly appeared behind him on his right side. He believed that he was only traveling thirty-five miles per hour and that the collision occurred because he was forced across the road by the police cruiser as he came around the curve.

In March of 1988, Graff, apparently intending to file a civil negligence action against the city stemming from the June 1, 1987 collision and aware that G.L.1956 § 9–31–2 limited his potential recovery to $100,000, had his attorney request introduction of a special act in the General Assembly that would permit him to recover up to $500,000 in his intended civil action. That special act was introduced and enacted by the General Assembly.

According to Graff, the introduction of the special act in the General Assembly did not go unnoticed, however, and served to trigger the events that would later culminate in the litigated case that is presently before us in this appeal. Although the appeal before us is not Graff's originally intended June 1, 1987 collision damage claim, Graff contends it is first cousin to it.

Graff asserts in the appeal before us, as he did in his Superior Court trial, that shortly after the introduction of his special act in the General Assembly in April 1988, its introduction was brought to the attention of the chief of the Warwick police department, Wesley Blanchard (Chief Blanchard). Chief Blanchard was thereby reminded of the Graff collision case and pending criminal charge, which as of April 1988 was still undisposed of, and he asked the then chief prosecution officer,

Captain DeFeo, to examine the Graff file to determine its current status. After reviewing the file and examining the police report, the witness statement, the summons, and an unsigned affidavit contained therein, Captain DeFeo felt there was sufficient probable cause to support the charge of eluding a police officer, and he then sought an arrest warrant from a District Court judge. A warrant was issued, and Graff was soon thereafter arrested, on October 1, 1988, on the charge of eluding a police officer. Graff alleges that he was taken to the Warwick police station and that while he was in police custody, Officer Blackmar, who would be a defendant in the 1987 collision claim, told Graff that he should "make it easy on [himself] and drop it." Graff interpreted that remark as a reference to his intention to file a civil suit arising out of the 1987 collision against the city of Warwick. The eluding a police officer charge was later dismissed by the District Court for failure on the part of the city to issue the summons in a timely manner. The merits of that criminal action were never reached.

Graff's basic contention at the trial below was that the eluding a police officer criminal complaint was filed in retaliation for his having introduced the special bill that permitted him to file a personal injury action against the city for the collision that occurred on June 1, 1987. The jury apparently believed Graff's contentions and awarded him $1,000 in compensatory damages on each of his false arrest/imprisonment, malicious prosecution, and abuse of process claims. They also awarded him $75,000 in punitive damages against the city.

## II

### Punitive Damages

The first claim of error raised by the city and Captain DeFeo in their appeal is that punitive damages cannot be awarded against a municipality. Historically, under the common law, the state, as well as a municipality, enjoyed sovereign immunity, which could be waived only by the state's deliberate and explicit waiver. *See Mulvaney v. Napolitano*, 671 A.2d 312, 312 (R.I.1995). Through G.L.1956 § 9–31–1, enacted in 1970, the General Assembly, however, explicitly provided that the State of Rhode Island and any political subdivision thereof could be held "liable in all actions of tort in the same manner as a private individual or corporation." Section 9–31–2 provided further that liability for governmental actions, those being actions normally performed by a governmental body, would be limited to $100,000.[1] Liability for proprietary actions, those being actions normally performed by private individuals, however, was unlimited.

Although § 9–31–1 purports broadly to waive the immunity of the state in all tort actions, we have always strictly construed that statute. "We therefore presume that the Legislature did not intend to deprive the State of any sovereign power 'unless the intent to do so is clearly expressed or arises by necessary implication from the statutory language.'" *In re Sherman*, 565 A.2d 870, 872 (R.I.1989)(quoting *Andrade v. State*, 448 A.2d 1293, 1295 (R.I.1982)). In *Sherman*, *Andrade*, and *Mulvaney, supra*, this Court was concerned with the award of interest in actions brought against the state. In those cases we concluded that § 9–31–1 did not contemplate an award of interest against the state because the language of § 9–31–1, although seemingly broad and unlimited, did not expressly address the issue of interest. Similarly, we now conclude that § 9–31–1 does not contemplate an award of punitive damages against the state because the language of § 9–31–1 also does not expressly address the issue of punitive damages. This conclusion is consistent with the holdings in the vast majority of other states that have decided the same issue.

In *Sharapata v. Town of Islip*, 56 N.Y.2d 332, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (1982), the New York court was concerned with New York's waiver of immunity statute that, much like the Rhode Island waiver of immunity statute, employed extremely broad language. The New York statute provided that "[t]he state hereby waives its immunity

---

**1.** The limitation on liability was $50,000 when G.L.1956 § 9–31–2 was first enacted by P.L. 1970, ch. 181, § 2, but it was increased to $100,-000 by P.L.1984, ch. 87, § 1.

from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations." *Id.* at 349, 437 N.E.2d at 1106 (quoting N.Y. Jud.—Ct.Acts § 8 (McKinney 1982)). The New York court noted that § 8 was silent in regard to punitive damages, much like its Rhode Island counterpart. The New York court also concluded, as we did in *Andrade, Sherman* and *Mulvaney,* that "a statute in derogation of the sovereignty of a State must be strictly construed, waiver of immunity by inference being disfavored." *Sharapata,* 452 N.Y.S.2d at 349, 437 N.E.2d at 1106. In so construing the New York statute, the court held that because of the mandate to construe statutes strictly in derogation of the common law and because the language of § 8 was silent concerning punitive damages, § 8 did not permit an award of punitive damages against the state or its local governments. The court found further that the policy behind punitive damage awards supported its conclusion.

The New York court explained that there are two justifications for punitive damages, punishment and deterrence, neither of which is furthered by an award of punitive damages against the state. When the state is held liable for punitive damages, "the self-same group who [is] expected to benefit from the public example which the granting of such damages supposedly makes of the wrongdoer" is the group that must bear the burden of the punishment, that group comprising the taxpayers and the citizens of the state or subdivision. *Id.* at 350, 437 N.E.2d at 1107. (quoting *Sharapata v. Town of Islip,* 82 A.D.2d 350, 441 N.Y.S.2d 275, 283 (1981)). *See also City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 263, 101 S.Ct. 2748, 2757, 69 L.Ed.2d 616, 629 (1981)("[i]n general, courts viewed punitive damages as contrary to sound public policy, because such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised"). Thus, the group that is supposed to benefit from the punishment's being imposed by the award of punitive damages is the same group that is being punished by the award, an anomalous result.

Furthermore, since the "punitive power of exemplary damages is largely proportionate to the financial sacrifice it means for the malefactor," the unlimited taxing power of the state or the locality would be a relevant inquiry for the determination of the punitive damage award, thereby potentially prejudicing a jury in favor of imposing a sizable punitive damage award. That action would result in both a windfall recovery for the plaintiff and a strain on local treasuries and services available to the public at large. 453 U.S. at 270–71, 101 S.Ct. at 2761–62, 69 L.Ed.2d at 634. It is for all the above reasons that the New York court in *Sharapata* joined with the vast majority of jurisdictions that have considered the award of punitive damages against a municipality and have refused to recognize a waiver of the sovereign immunity for such damages absent explicit direction by the Legislature to do so. *See* Joel E. Smith, Annotation, *Recovery of Exemplary or Punitive Damages from Municipal Corporation,* 1 A.L.R.4th 448 (1980)(also containing the few minority view cases that have permitted an award of punitive damages against the state). We conclude that the no-punitive-damage approach is the better approach. Accordingly, we vacate the punitive damage award against the city of Warwick both because the legislative wording employed in § 9–31–1 does not explicitly permit or contemplate an award of punitive damages and because any award of punitive damages against a state or municipality is contrary to public policy.

### III

### Motions for a Directed Verdict [2]

The next claim of error by the city of Warwick and Captain DeFeo is that the trial justice erred in not granting their motions for a directed verdict on the malicious prosecution and false arrest/imprisonment counts in Graff's complaint. The city and Captain DeFeo contend that there was no evidence

---

2. Pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, as amended in 1995, motions for directed verdict are now designated as motions for judgment as a matter of law.

presented that was sufficient to prove that the evading a police officer charge was instituted without probable cause, a necessary showing for recovery on Graff's malicious prosecution claim. They contend also that there was no proof that Graff was detained "without legal justification or without any color of legal authority," *Mailey v. Estate of DePasquale*, 94 R.I. 31, 34, 177 A.2d 376, 379 (1962), a necessary element for the false arrest/imprisonment claim. Accordingly, the city and Captain DeFeo assert that their motions for a directed verdict on Graff's false arrest/imprisonment and malicious prosecution claims should have been granted.

 In reviewing a trial justice's decision on a motion for directed verdict, we must use the same standard as the trial justice. *Cinq-Mars v. Rodriguez*, 674 A.2d 401, 405 (R.I.1996)(citing *Young v. Park*, 417 A.2d 889, 893 (R.I.1980)). Thus, we "must view the evidence in the light most favorable to the party opposing the motion and draw all reasonable favorable inferences therefrom without weighing the evidence or considering the credibility of the witnesses." 674 A.2d at 405 (citing *Vaz v. Bastien*, 599 A.2d 1363, 1364 (R.I.1991)). "If the evidence viewed in this light would justify a reasonable jury's finding for the plaintiff, the jury is entitled to decide the facts and the motion should be denied." 674 A.2d at 405 (citing *Rodrigues v. Miriam Hospital*, 623 A.2d 456, 460 (R.I. 1993)). "If, however, after this analysis of the evidence, the trial justice concludes that no reasonable jury could find for the plaintiff, the motion should be granted." 674 A.2d at 405 (citing *Izen v. Winoker*, 589 A.2d 824, 827 (R.I.1991)). Applying that standard to the facts of this case, we conclude that the trial justice did not err in denying the defendants' motions for a directed verdict.

 Given the evidence presented at the trial below, a reasonable jury could have concluded that the evading a police officer charge was resurrected and filed without probable cause and in retaliation for the special act that Graff had requested be introduced in the General Assembly to permit him

to recover increased damages against the city of Warwick. There was also evidence presented that the date on the police summons relating to its being issued on June 1, 1987, the date of the collision, had been altered. Furthermore, there was evidence that suggested that certain documents that were supposed to have been part of the police record maintained on the June 1, 1987 collision were missing or never existed. Additionally, Officer Blackmar's comment to Graff after he was arrested, that he should "make it easy on [himself] and drop it," could serve to support Graff's allegation of malice in the police department's institution of the criminal prosecution against him. The lapse of time, almost a full year, between the collision and the issuance of the arrest warrant could also permit a jury to infer that the criminal proceeding lacked probable cause. In viewing all the above evidence in the light most favorable to Graff, a reasonable jury could certainly have concluded that the city and Captain DeFeo were liable on the malicious prosecution claim in Graff's complaint. Moreover, in support of Graff's false arrest/imprisonment claim, the aforementioned evidence could have also caused a reasonable jury to conclude that the city of Warwick and Captain DeFeo were acting without legal justification when they procured the warrant from the District Court for Graff's arrest. Accordingly, the trial justice did not err in denying the motions for directed verdict.

 Notwithstanding our conclusion that the trial justice did not err in denying the motions for directed verdict, Graff is not entitled to the multiple recoveries resulting from the separate counts alleged in his complaint. The trial record discloses that the only damages claimed and proven by him were for the counsel fees he was required to pay in resisting the misdemeanor motor vehicle charge and for several days' loss of wages caused by his court appearances. Those damages were all of singular event.[3] He only paid his lawyer once, and he only once lost several days from work. He cannot then under our law recover three times for the

---

**3.** Graff paid $1,050 for legal fees and sustained $577.92 in lost wages. There were no physical injuries or medical expenses incurred, according to Graff's response to defendants' interrogatories.

same loss. "A plaintiff's recovery against a defendant under one tort theory precludes any duplicative recovery for the same damages under some other tort theory." *Borden v. Paul Revere Life Insurance Co.*, 935 F.2d 370, 383 (1st Cir.1991). *See also DeCosta v. Viacom International, Inc.*, 758 F.Supp. 807, 812 (D.R.I.1991)("a plaintiff may not get additional bites of the apple by demanding multiple forms of relief for the same injury or by cloaking a single claim in a variety of legal theories"); *Calimlim v. Foreign Car Center, Inc.*, 392 Mass. 228, 467 N.E.2d 443, 448 (1984)("where the same acts cause the same injury under more than one theory * * * duplicative damage recoveries will not be permitted").

■ The jury found that Graff had sustained total damages in the amount of only $1,000. Under our law that is all he is entitled to receive from the defendants. Accordingly, the jury's award for $1,000 on each of Graff's theories advanced in pursuing recovery for his damages resulted in multiple recovery by him for the same single amount of his damages. As a result, even though the jury verdicts have determined the culpability of both defendants with regard to Graff's claims for abuse of process, malicious prosecution, and false arrest/imprisonment, Graff can only recover once for the total damages the jury found he sustained, namely $1,000.

## IV

### 42 U.S.C. § 1983

■ We next address Graff's cross-appeal on his 42 U.S.C. § 1983 civil rights claim. As an initial matter, we note that Graff failed to object to what he refers to as an inconsistency in the jury verdicts. He raised the inconsistent verdict claim for the first time in his motion for new trial. Ordinarily that failure to object at the time the verdicts were returned when the court could have permitted the jury to reconsider and/or correct its verdicts might amount to waiver of that claim of error; nevertheless, we conclude that Graff's contentions are of sufficient importance to warrant our consideration, so we shall address them.

■ Graff argues that a verdict in his favor on his state law causes of action results in a *per se* finding for him on his 42 U.S.C. § 1983 claim. However, Graff is incorrect. In order to prevail on a § 1983 claim, a plaintiff must assert more than "that a common law tort was committed by a state official." *Bell v. Brennan*, 570 F.Supp. 1116, 1118 (E.D.Penn.1983)(citing *Cramer v. Crutchfield*, 648 F.2d 943, 945 (4th Cir.1981)). "Rather, a plaintiff must allege deprivation of some constitutional right under color of law." *Id.* *See also Dunn v. State of Tennessee.*, 697 F.2d 121, 125 (6th Cir.1982), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983)("[n]either the Fourteenth Amendment nor [42 U.S.C. § ] 1983[was] designed to redress all injuries incurred by reason of unfounded or malicious claims brought in state court actions[;][n]evertheless, if the misuse of a legal proceeding is so egregious as to subject the aggrieved individual to a deprivation of constitutional dimension, and the tortfeasor is acting under color of state law, [§ ] 1983 may be employed"); *Jones v. Diamond*, 594 F.2d 997, 1011 (5th Cir. 1979)("[w]ith nothing more, the mere violation of state law by a state official is not a violation of a federal right, and the federal courts would lack jurisdiction to entertain such a claim[;][i]f, however, under color of state law, someone violates a 'specific constitutional guarantee', then 42 U.S.C. § 1983 becomes applicable"); *Graves v. Wayne County*, 577 F.Supp. 1008, 1011 (E.D.Mich.1984)("[s]ection 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law[;][r]emedy for the latter type injury must be sought in state court under traditional tort-law principles"); *Jolicoeur Furniture Co. v. Baldelli*, 653 A.2d 740, 751 (R.I.1995)(" '[t]hat one of the parties to the controversy is a governmental unit does not automatically convert a common law * * * action to a [42 U.S.C. § ] 1983 claim' "). Thus, we conclude, in a manner directly contrary to Graff's assertions that recovery on state law claims does not amount to per se recovery on his 42 U.S.C. § 1983 claim. The court in *Braley v. City of Pontiac*, 906 F.2d 220 (6th Cir.1990), a case involving facts somewhat similar to the case now

before us, cogently explained the difference between state tort claims and 42 U.S.C. § 1983 claims.

In *Braley* the plaintiff was cut off by a police car while driving along a city road. The plaintiff followed the police car after it cut in front of him and signaled with his horn and lights for the police car to pull over. When the officer stopped his car, the plaintiff also stopped his car and began a verbal assault with the officer. The plaintiff told the officer that he planned to file a complaint against him. The officer then asked the plaintiff for his license, which the plaintiff refused to produce. The officer then arrested the plaintiff and detained him overnight. The plaintiff was arraigned the next day on charges of operating a motor vehicle without a license and obstructing and hindering a police officer in performance his duties. A jury found the plaintiff not guilty on both those charges. The plaintiff then filed a suit in federal court, alleging 42 U.S.C. § 1983 violations as well as three pendent state claims for malicious prosecution, false arrest and imprisonment, and intentional infliction of emotional injury. The federal court dismissed the state claims without prejudice. The plaintiff then raised his state claims in a complaint filed in state court while the federal action was pending. A jury in the state court action found in favor of the plaintiff on the malicious prosecution and false arrest and imprisonment claims.[4] The federal court then granted the defendants' summary judgment motions filed in the federal action because the court felt that as a result of the favorable verdict in the state court action, the plaintiff's allegations of constitutional violations had already been sufficiently addressed. The plaintiff appealed from that decision and the appellate court affirmed.

The appellate court explained that "an action brought under [42 U.S.C.] § 1983 is supplemental to a common law action arising out of the same factual circumstances." *Braley*, 906 F.2d at 223. Thus, 42 U.S.C. § 1983 claims and state tort law claims can be pursued simultaneously. *Id.*

However, two vindications of that claim are not permitted. *Id.* Nevertheless, "[a] supplemental § 1983 action is available where it seeks to vindicate a constitutional right that was not adequately vindicated by the state law action." *Id.* The court in *Braley*, when examining the specific facts of that case, concluded that the plaintiff there was not raising "any constitutional guarantees that were not vindicated through the state remedy." *Id.* at 224. The court went on to acknowledge that the recovery permitted in the state court action may not be identical to the recovery permissible under a § 1983 claim. However, the court, after considering cases that barred § 1983 actions after favorable outcomes on state tort law claims, concluded that the differences in available recovery were not sufficient justification for a separate 42 U.S.C. § 1983 action. *Cf. Dyson v. City of Pawtucket*, 670 A.2d 233 (R.I. 1996)(Court vacated 42 U.S.C. § 1983 damage award because plaintiff had already recovered actual damages on state law claims arising from same set of facts as were the basis for the § 1983 claim).

The court in *Braley* went on to consider whether, regardless of the impact of state law claims on a 42 U.S.C. § 1983 action, the plaintiff stated a constitutional violation on which his § 1983 claim could be based. Beginning its discussion of each of the possible constitutional violations on which the plaintiff's § 1983 claim could be based, the court held that pursuant to the rule set forth in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), there was no basis on which to find a violation of the plaintiff's procedural due process rights. In *Parratt*, the Supreme Court held that "a cause of action under [42 U.S.C.] § 1983 is not available if there exists a state remedy that comports with procedural due process." *Braley*, 906 F.2d at 225. Therefore, since the plaintiff in *Braley* pursued state remedies that adequately comported with procedural due process, no violation thereof occurred.

4. The intentional infliction of emotional injury claim was directed out before the case was given to the jury.

The *Braley* court also explained that the plaintiff's allegation did not amount to a substantive due process violation. "The protections of the Constitution are not coextensive with the protections of the common law; the fact that appellant won in his tort action against appellee for false arrest, false imprisonment and malicious prosecution does not mean that he has stated a constitutional violation." 906 F.2d at 226. The court went on to explain specifically that the common law tort of malicious prosecution is insufficient, in and of itself, to support a 42 U.S.C. § 1983 claim. The criminal prosecution being attacked must also have had "the effect of causing a violation of a constitutional guarantee." *Id.* at 227. *See also Bell,* 570 F.Supp. at 1118 ("[m]alicious prosecution generally does not constitute such a [constitutional] deprivation * * * [a]n exception exists where the malicious prosecution is conducted with an intent to deny a person equal protection or which otherwise subjects a person to denial of constitutional rights"). Likewise, Graff's allegations of false arrest/imprisonment must also be of such magnitude as to constitute a constitutional deprivation. We find the analysis in *Braley* persuasive.

We conclude on the basis of the evidence presented at the trial below, that it was reasonable for the jury to conclude that although the acts alleged by plaintiff were sufficient to establish liability under state tort law, they did not rise to the level of a constitutional deprivation. Furthermore, with respect to Graff's 42 U.S.C. § 1983 claim against the city of Warwick, Graff would also have to prove, in addition to the elements discussed above, that the actions of Captain DeFeo were taken in accordance with an overall policy or custom of the city of Warwick to deprive the citizens of that city of their constitutional rights. *See Monell v. Department of Social Services of New York,* 436 U.S. 658, 691–92, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611, 636 (1978). *See also City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Since there was no evidence presented to establish such a policy or custom by the city of Warwick, the jury could have reached no other conclusion than the one that it did. Although the trial justice did not fully articulate her reasons for denying Graff's motion for new trial on his 42 U.S.C. § 1983 claim, we can reasonably assume, relying on the evidence presented and not presented, at the trial below, that she felt that the jury's verdict was in accordance with the weight of the evidence. Accordingly, we affirm the final judgment reflecting the jury's verdict on Graff's 42 U.S.C. § 1983 claims.

## V

### Joint and Several Liability

In regard to Graff's second allegation on his cross-appeal, that Captain DeFeo should be made jointly and severally liable for the compensatory damages awarded against the city of Warwick, we sustain the appeal. The city of Warwick was found liable on Graff's malicious prosecution, false arrest/imprisonment, and abuse of process claims. Additionally, Captain DeFeo was found both individually liable and liable in his official capacity on those same claims. Since both the city of Warwick and Captain DeFeo were found liable for having caused the same injury to Graff, the failure of the jury to assess compensatory damages against Captain DeFeo was erroneous. "[T]he term 'joint tortfeasors' means two (2) or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." G.L.1956 § 10–6–2. Accordingly, as joint tortfeasors both the city of Warwick and Captain DeFeo are jointly and severally liable for the $1,000 compensatory damage award we are affirming in this opinion.

## VI

### Conclusion

For all the foregoing reasons, the appeal of the city of Warwick and Captain DeFeo is sustained in part and denied in part, and the cross-appeal of Graff is sustained in part and denied in part. The judgment appealed from is vacated in part and affirmed in part. The papers in this case are remanded to the

Superior Court with directions to enter judgment in accordance with this opinion.

GOLDBERG, J., did not participate.