Victoria Roach                    :

v.                    :

State of Rhode Island et al.            :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2014-204-Appeal.
(PC 09-4465)
(Dissent begins on page 26)

Victoria Roach                    :

v.                       :

State of Rhode Island et al.          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**  This civil matter comes before the Court on appeal from a Superior Court judgment in favor of the plaintiff, Ms. Victoria Roach (Roach or plaintiff). The plaintiff slipped and fell while she was working as a per diem contract nurse at the Rhode Island Veterans Home (Veterans Home or the Home) on November 10, 2008.  She brought suit against the State of Rhode Island and Gary Alexander in his official capacity as Director of the Rhode Island Department of Human Services (collectively, the state).

The case was tried before a jury beginning on March 12, 2014.  At the conclusion of plaintiff's case-in-chief, the state moved for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, which the state renewed at the close of the evidence.  On March 19, 2014, the jury awarded plaintiff $500,000.  Under Rule 59(e) of the Superior Court Rules of Civil Procedure, the state then filed a motion for new trial, and a motion to amend judgment and for a remittitur.  The trial justice granted a remittitur, lessening plaintiff's award to $382,000; however, the prejudgment interest award increased the judgment to $631,373.66.

The state asserts multiple arguments on appeal: (1) the public-duty doctrine shields the state from liability; (2) the statutory tort cap in G.L. 1956 § 9-31-2 limits damages to $100,000; (3) the prejudgment interest award was improper; (4) the trial justice erred in denying the state's motion for judgment as a matter of law; and (5) the trial justice erred in failing to instruct the jury on comparative negligence. For the reasons set forth below, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

### A

### Background

The Veterans Home serves as a nursing home for many of Rhode Island's veterans.[1] Statutorily organized and governed under Rhode Island's Department of Human Services, its population generally spans between ages seventy and eighty, with many residents having served in World War II and the Korean War. Dispersed in multiple units, the Home's residents range from totally independent to bedridden. Each unit includes two wings (sides A and B), with each side housing about thirty to forty patients.

Of particular relevance here is Unit N-7 (N-7). A "skilled unit," N-7 included residents requiring heightened care and palliative (end-of-life) residents.[2] As such, a charge nurse,[3] a staff

---

[1] Residency at the Home is limited to Rhode Island resident veterans having served during a time of war.

[2] The unit included residents with chronic obstructive pulmonary disease (COPD), residents undergoing psychiatric treatments, and amputees. Many N-7 residents required help getting out of bed and ambulating, using the bathroom, eating, and bathing.

[3] The charge nurse oversaw a particular unit, which included nurse and CNA oversight.

nurse,[4] and several Certified Nursing Assistants[5] (CNAs) staffed the unit during a typical shift. A supervisory RN oversaw the Home's nursing operation, including resident-care oversight and nurse supervision. Nurses worked during three shifts: 8 a.m. to 4 p.m.; 4 p.m. to 12 a.m.; and 12 a.m. to 8 a.m.

At the start of a 4 p.m. shift, CNAs went directly to their respective room assignments and checked whether residents needed washing or changing.[6] This was important because residents could not visit the dining room if soiled and often had not been checked or cleaned for a few hours. However, the CNAs prioritized transporting residents to the dining room because they ate dinner early, around 4:30 p.m. Additionally, CNAs provided meals and fed the few residents who did not leave their rooms. Generally, three CNAs assisted residents to the dining room while one CNA fed residents in their rooms.

**B**

**The Accident**

On November 10, 2008, Roach reported to work for her Veterans Home assignment, arriving around 3:45 p.m. for the 4 p.m. to 12 a.m. shift. As a contract nurse[7] unacquainted with the Home's operations, Roach briefly met with N-7's charge nurse, Ms. Cheryl Kelley. Until about 4:25 p.m., Kelley orientated Roach with N-7, showing her the treatment cart, medical cart, bathroom, and kitchen. Then, Roach familiarized herself with N-7's residents' medications,

---

[4] Working at the charge nurse's direction, an N-7 staff nurse, who could be a Registered Nurse (RN) or Licensed Practical Nurse (LPN), primarily distributed resident medication, usually to either the A or B wing.

[5] CNAs delivered meals to residents, fed, washed, toileted, and ambulated them.

[6] Because most on-duty CNAs regularly worked in N-7, they needed little guidance in fulfilling their duties.

[7] Roach worked on a per diem basis for MAS Medical Staffing.

- 3 -

which she planned to administer until about 5 p.m. While administering medications, she traveled down N-7's "B" side hallway, beginning with Room B-1.

Roach eventually arrived at Room B-7—the room from which the crux of this case arises. At the time, Room B-7 housed two resident-patients.[8] Resident 1, a double amputee, often remained in his wheelchair. He was capable of pushing himself around the Home and usually wheeled himself to the dining room at dinnertime. In addition to being non-ambulatory, Resident 1 was incontinent, so nurses would assist him in accessing the toilet via a lift, transporting him from his bed or wheelchair to the toilet, and back. Resident 2 had end-stage Parkinson's disease. He rarely left his room or his bed, and he required nurse assistance to move from his bed to his wheelchair. Due to his lack of mobility, CNAs assisted Resident 2 with dinner in his room.

Roach proceeded to administer Resident 2's medication. He required one medication, which she administered in a 30-cubic-centimeter (cc) cup along with a 90-cc Dixie cup filled about halfway with water. After he took his pill, about 30 ccs of excess water remained in his cup. Roach tossed the medication cup in the trash near B-7's entrance and approached the bathroom to dump the excess water in the sink.

Walking towards the bathroom with the water cup in her right hand, Roach reached inside the room with her left hand and attempted to flick on the light switch.[9] However, before reaching the sink, she slipped and fell on the bathroom floor. Wearing her Nurse Mate sneakers,

---

[8] For privacy purposes, we refer to both residents as Resident 1 and Resident 2. Resident 1 refers to the B-7 resident whose bed was closest to the door, and Resident 2 refers to the resident located proximate to the room's window.

[9] At trial, plaintiff offered diverging testimony regarding whether she turned on the light before or after entering the bathroom.

Roach recalled hydroplaning on liquid and landing in a split position. Roach felt "excruciating" pain, and her knee cracked on the way down.

While on the floor, Roach felt liquid on both sides of her. It was enough liquid to dampen both the back and side of her pants. Based on its smell, Roach believed the liquid was cleaning solution or soapy water used to bathe residents. Unable to reach the call light above her on the wall, Roach yelled out multiple times for help, to no avail. With no one around to assist, she used her uninjured leg to push herself up and out of the bathroom. Relying on the medical cart for support, Roach then made her way down the hall to the nursing station.

At the nursing station, Roach notified Kelley of her fall. Kelley provided Roach with an ACE bandage wrap and ice pack. She also gave Roach an incident report, which Roach completed shortly thereafter. Kelley retained a mop and bucket and went to Room B-7 to clean up the spill. Kelley recalled needing only one mop swipe to clean the liquid. Although plaintiff remained in pain, which she described as a "ten" on a one-to-ten scale, she completed her shift.

## C

### Bathroom Access

While the jury heard no direct evidence regarding how the liquid reached the bathroom floor, the parties presented circumstantial evidence detailing the possible events leading to Roach's slip and fall. All staff members, including nurses, CNAs, and housekeeping, could access B-7 and its bathroom. Additionally, the Home allowed visitors, who could access the Home and B-7, including the bathroom.

In particular, Heritage Healthcare Company (Heritage or housekeeping) cleaned the Home's rooms and bathrooms daily, including on November 10.[10] Housekeepers worked

---

[10] The Home contracted with Heritage for daily cleaning services.

between 7 a.m. and 3 or 3:30 p.m. They cleaned bedside tables, floors, and bathrooms, including the sink, toilet, and floor. Ms. Thelma Garcia, the Heritage housekeeper who cleaned the Home on November 10, cleaned N-7's rooms between 9 a.m. and 11:30 a.m. She was also available after 11:30 through the end of her shift to respond to any calls to clean spills. The housekeeping manager, Ms. Maria Depina, inspected each room daily around 1:30 p.m. Depina testified that her staff used an orange cleaning solution to clean floors—a color that she claimed was visible both in the cleaning bottle and on the floor. Housekeeping kept cleaning products locked in a closet, which Depina testified only the housekeeping manager and assistant manager could access. Depina said that she could not recall whether housekeeping received a call to clean a spill after the November 10 morning cleaning.

Beyond housekeeping, nurses and CNAs also accessed unit bathrooms. Several nurses and CNAs testified that they accessed the bathroom during the resident-cleaning process. Generally, CNAs used one of two resident-cleaning methods: either Perineal (Peri) Spray and disposable wipes, or a bucket of soapy water and a washcloth.[11] For the latter method, CNAs washed residents either bedside or over the toilet. When finished, the CNAs disposed of excess soapy water in the toilet.

Regarding B-7, Kelley testified that CNAs washed Residents 1 and 2 either bedside or over the toilet. If over the toilet, Kelley said that the CNAs cleaned Resident 1 with Peri Spray, while if they cleaned him at his bedside, they probably used warm water and soap. Ms. Ursula Souza, the N-7 LPN on duty before Roach during the 8 a.m. to 4 p.m. shift, testified that CNAs

---

[11] Ms. Charlene Demello, a CNA with twenty years of experience at the Home, described the washing process. She testified that, "[y]ou would go in the bathroom and -- you would first get the bucket, bring the bucket into the bathroom, get the water in the bucket, bring it to [the patient's] bedside, wash them up, and then empty the water out immediately because in the process of getting them up, you don't want to drop any of that water on the floor."

always washed B-7 residents at their bedsides. She also noted that CNAs disposed of washing materials and water in bathrooms. Additionally, Ms. Patricia Brum, a CNA who worked in N-7 during Roach's shift, testified that she used the bathroom to wash out any used urinals. Nurses also accessed bathrooms to wash their hands.

Because housekeeping staff left around 3:30 p.m., the nurses cleaned up spills after this time. Employees, including CNAs, consistently testified that if a CNA or nurse noticed a spill, they were responsible for cleaning it up. LPN Souza and CNA Demello covered Room B-7 during the 8 a.m. to 4 p.m. shift on November 10. Specifically, Demello cared for Resident 1 and eight to ten other B-wing residents. Souza testified that she could not recall seeing liquid on B-7's floor at the end of her November 10 shift; however, she also could not recall whether she looked in the bathroom. She did note, though, that if she saw liquid, she would clean it up. Demello testified that she clearly remembered seeing no liquid anywhere in B-7 or its bathroom when she finished her shift. As a "perfectionist," Souza stated that she double-checked her residents and rooms often.[12] She first noted that she checked every hour, hour-and-a-half at most, but later testified that CNAs should check residents every two hours.

CNA Mr. Allemand (Al) Morantus assisted one of B-7's residents during the 4 p.m. to 12 a.m. shift on November 10. He could not recall whether he cared for both B-7 residents. While he did not remember a spill that evening, he noted the importance of cleaning spills, stating, "If you don't [pick up spilled liquid], any nurses see that, you can get punished for that. That's why everybody have [sic] a concern about it." Morantus also noted that resident care during this shift does not begin until approximately 6:45 to 7 p.m. Another CNA, Ms. Francisca Pires, never

---

[12] Interestingly, Demello did not initial a standard nursing observation record during her November 10 shift. When asked why she failed to complete the form, she repeatedly responded "Nolo," which she asserted meant she could not answer the question. She did, however, assert that it was not because she was too busy to initial the form during her shift.

recalled meeting Roach nor did she recall her falling that day. She stated that if someone fell, she would have heard about it or seen an ambulance. When asked whether she remembered visiting B-7 or hearing reports of spills between 4 and 5 p.m. on November 10, Kelley replied in the negative.[13]

Finally, the jury heard testimony regarding visitor access to the Home and N-7. Although rare, Kelley testified that some Home residents have had visitors who could access the Home units almost any time during the day. Further, Kelley recalled that she never saw family members visit Resident 1 as he did not have family. She did not remember visitors for Resident 2, but she recalled that he had an out-of-state daughter. Souza, however, testified that Resident 2 occasionally had visitors; though she could not specifically recall the last time someone visited. Roach testified that on the evening in question, she did not observe any visitors between 4 and 5 p.m. and claimed that she would have noticed if anyone visited.

## D

### The Aftermath

As a result of the fall, Roach saw numerous physicians, underwent arthroscopic surgery, and engaged in several months of physical therapy, both before and after surgery. Although Roach experienced a torn anterior cruciate ligament (ACL) and torn meniscus, her surgery addressed only her torn meniscus.

Roach did not resume nurse employment for about three-and-a-half years. When she resumed work in the fall of 2012, she modified her schedule from forty hours per week to sixteen. Although she earned approximately $1,250 before taxes based on a forty-hour work

---

[13] Pires's testimony seemed to suggest that she had difficulty understanding the English language. Similarly, the trial justice noted that Morantus seemed to have trouble with English, and at certain points, it seemed that he simply agreed with questions, when posed in a leading form.

week, she earned about $450 before taxes based on a sixteen-hour work week. After her fall, Roach wore a brace on her injured knee for assistance and support while working.

After hearing arguments and considering all pending motions, the trial justice issued a bench decision on April 17, 2014. She denied the state's Rule 50 motion for judgment as a matter of law, finding that reasonable minds could differ and that there was sufficient evidence for a reasonable juror to side with Roach in terms of liability. Additionally, the trial justice found the public-duty doctrine inapplicable. In denying the state's Rule 59 motion for a new trial, she found her jury charge correct, especially regarding her rejection of a jury instruction on open and obvious dangers, comparative negligence, and assumption of risk. Finally, the trial justice granted the state's request for a remittitur, reducing the jury's award by $118,000 to $382,000. Approximately $250,000 in prejudgment interest was added to this amount, giving Roach a total award of $631,373.66. On April 30, 2014, the state appealed the judgment. This opinion sets forth further relevant facts as needed.

## II

## Standards of Review

### A

### Public-Duty Doctrine, Statutory Tort Cap, and Prejudgment Interest

This Court reviews pure questions of law under a de novo standard. Drescher v. Johannessen, 45 A.3d 1218, 1227 (R.I. 2012) (citing Lamarque v. Centreville Savings Bank, 22 A.3d 1136, 1140 (R.I. 2011)).

**B**

**Motion for Judgment as a Matter of Law**

"Our review of a trial justice's decision on a motion for judgment as a matter of law is <u>de novo</u>." <u>McGarry v. Pielech</u>, 47 A.3d 271, 279 (R.I. 2012) (quoting <u>Medeiros v. Sitrin</u>, 984 A.2d 620, 625 (R.I. 2009)). "The trial justice, and consequently this Court, must examine 'the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw * * * from the record all reasonable inferences that support the position of the nonmoving party.'" <u>Roy v. State</u>, 139 A.3d 480, 488 (R.I. 2016) (quoting <u>Hough v. McKiernan</u>, 108 A.3d 1030, 1035 (R.I. 2015)). "Judgment as a matter of law is appropriate, if, after conducting this examination, the trial justice 'determines that the nonmoving party has not presented legally sufficient evidence to allow the trier of fact to arrive at a verdict in his favor.'" <u>O'Connell v. Walmsley</u>, 93 A.3d 60, 66 (R.I. 2014) (quoting <u>McGarry</u>, 47 A.3d at 280). "However, the trial justice must deny the motion and submit the issues to the jury if there are factual issues on which reasonable people may draw different conclusions." <u>Medeiros</u>, 984 A.2d at 625.

**C**

**Jury Instructions**

"[T]he standard of review for jury instructions is well settled. A charge 'need only adequately cover[] the law.'" <u>State v. Long</u>, 61 A.3d 439, 445 (R.I. 2013) (quoting <u>State v. Cardona</u>, 969 A.2d 667, 674 (R.I. 2009)). "This Court examines 'the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, * * * and * * * review[s the] challenged portions * * * in the context in which they were rendered.'" <u>Id.</u> (quoting <u>Cardona</u>, 969 A.2d at 674). "A 'trial justice is bound to

ensure that the jury charge sufficiently addresses the requested instructions and correctly states the applicable law.'" Id. (quoting State v. Sivo, 925 A.2d 901, 913 (R.I. 2007)). "[A]n erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." Id. (quoting Sivo, 925 A.2d at 913).

## III

## Discussion

## A

## Public-Duty Doctrine

Under traditional common-law sovereign immunity, individuals lacked recourse for state-induced tortious injuries. Grounded in the common-law theory that "The King Can Do No Wrong," this liability-shielding principle was the law in Rhode Island for much of the twentieth century. See Catone v. Medberry, 555 A.2d 328, 330 (R.I. 1989). However, in 1970, this Court in Becker v. Beaudoin, 106 R.I. 562, 571-72, 261 A.2d 896, 901-02 (1970), pivoted away from this rule, abrogating sovereign immunity as applied to municipal and quasi-municipal corporations.

Following Becker, the General Assembly enacted the Rhode Island Tort Claims Act, § 9-31-1, as enacted by P.L. 1970, ch. 181, § 2. Through § 9-31-1, the General Assembly further chiseled away at common-law immunity, construing state tort liability in a manner akin to that of a private person or corporation, while also confining potential damages. To the extent that governmental immunity survived Becker, § 9-31-1 held the state and its agents liable in tort in an attempt to legislatively abrogate what remained of common-law sovereign immunity.

This Court interpreted § 9-31-1 for the first time in Calhoun v. City of Providence, 120 R.I. 619, 390 A.2d 350 (1978). In Calhoun, the Court began to demarcate an exception to the

§ 9-31-1 liability imposition—today known as the public-duty doctrine. Specifically, while acknowledging that the General Assembly significantly broadened the state's susceptibility to tort suit, the Court remarked, "[W]e do not believe that the Legislature ever intended the statute to operate so as to impose liability upon the state for any and all acts or omissions of its employees and officers which might cause injury to persons." Calhoun, 120 R.I. at 625, 390 A.2d at 353. This Court, therefore, recognized "a zone of governmental operation which should be insulated from tort claims, even in the absence of sovereign immunity * * * ." Id. at 629, 390 A.2d at 355.

In O'Brien v. State, 555 A.2d 334, 336-37 (R.I. 1989), this Court shed further light on the public-duty doctrine:

> "[It] does not resurrect the concept of sovereign immunity but it does take into account the unquestionable fact that many activities performed by government could not and would not in the ordinary course of events be performed by a private person at all. Among such activities would be those that we have considered in our cases, such as licensing of drivers, management and parole of incarcerated prisoners, and the exercise of the police power through officers authorized and empowered by the state to perform a police function. We believe that the exercise of these functions cannot reasonably be compared with functions that are or may be exercised by a private person.
>
> "However, the state as a landowner or an owner of motor vehicles, to mention only two of its activities, performs the identical function that a private person might perform or which a private person might well parallel, and therefore, the duties of the state as landowner or owner or operator of motor vehicles should be the same as that of any private person or corporation as the Legislature has ordained in § 9-31-1." (Emphasis added).

The current jurisprudential landscape of the public-duty doctrine shields the state from liability in limited circumstances. Namely, the public-duty doctrine immunizes the state from "tort liability arising out of discretionary governmental actions that by their nature are not

ordinarily performed by private persons[.]" Morales v. Town of Johnston, 895 A.2d 721, 730 (R.I. 2006) (quoting Schultz v. Foster-Glocester Regional School District, 755 A.2d 153, 155 (R.I. 2000)). From this doctrine, the Court has carved out exceptions, which if present, may impose state liability. These exceptions include "(1) when the governmental entity owes a 'special duty' to the plaintiff, [and] (2) when the alleged act or omission on the part of the governmental entity [is] egregious * * * ."[14] Medeiros, 984 A.2d at 628 n.7 (quoting Schultz, 755 A.2d at 155). Here, the parties stipulated that neither exception applies; thus, we limit our analysis to the public-duty doctrine's application to the facts of this case.

As such, under our analysis of the public-duty doctrine, we differentiate between "discretionary" governmental activities and acts capable of performance by private citizens. For example, in Catone, 555 A.2d at 333, we noted that, "[The] need to protect the government's ability to perform certain functions is particularly relevant when the activity in question involves a high degree of discretion such as governmental planning or political decision making." See also Toegemann v. City of Providence, 21 A.3d 384, 387 (R.I. 2011) ("[T]he city's placement of traffic-control devices * * * is precisely the type of discretionary governmental activity that is shielded from tort liability under the public-duty doctrine."); Houle v. Galloway School Lines,

---

[14] We note that, in certain instances, this Court has highlighted a third public-duty doctrine exception: "when the governmental entity engaged in [non-discretionary] activities normally undertaken by private individuals or corporations." Medeiros v. Sitrin, 984 A.2d 620, 628 n.7 (R.I. 2009) (quoting Schultz v. Foster-Glocester Regional School District, 755 A.2d 153, 155 (R.I. 2000)); see also Morales v. Town of Johnston, 895 A.2d 721, 730 n.10 (R.I. 2006); Martinelli v. Hopkins, 787 A.2d 1158, 1167 (R.I. 2001). Although for analytical purposes this is a distinction without a difference, structurally, we analyze this private-person ordinary-activity test under the general rule, rather than as an exception. See Houle v. Galloway School Lines, Inc., 643 A.2d 822, 825-26 (R.I. 1994).

Inc., 643 A.2d 822, 826 (R.I. 1994) (holding that municipal school bus route design constituted discretionary government activity).

Applying the correct standard, the trial justice found the public-duty doctrine inapplicable. The trial justice noted that the Veterans Home performs tasks analogous to private nursing homes, in that it houses and cares for patients, which includes care from agency-employed nurses. Further, she found that the Home's sole distinguishing characteristic from a private nursing home is its legislatively defined population and funding structure, which bestows oversight authority on the Director of Human Services. The trial justice stated that, similar to how a private nursing home decides internal-policy matters, bylaws govern the Home's internal processes. She also noted that daily nursing care and nursing care facilities are not unique to state entities.

The trial justice considered whether the public-duty doctrine applies "solely due to the fact that the Veterans' Home is a creature of statute and the duties of which patient population, funding, and administration are statutorily imposed." In refusing to apply the public-duty doctrine, the trial justice first rejected the state's assertion that the Veterans Home is distinct because its duties are statutorily imposed, noting that she could not "think of any of the [s]tate's duties that are not statutorily imposed and regulated." Further, she cited Adams v. State Department of Corrections, 973 A.2d 542 (R.I. 2009), noting that the public-duty doctrine test turns on the "actual function." In sum, the trial justice focused on the underlying activity and whether a private person or corporation could carry it out. She reasoned that because the Veterans Home performed a function that private persons routinely performed, the public-duty doctrine did not apply.

The discrete function here—that is, care for nursing home resident-patients—is not the type shielded from tort liability. Although the parties agree that we must analyze whether the state is engaged in a function capable of private-party performance, the parties diverge on the vantage point from which we conduct this analysis. For instance, the state confines the function to the Veterans Home's maintenance, which it argues a private person cannot replicate because the Home is statutorily created with its management vested in the Director of Human Services. The plaintiff, however, asserts that this Court should view the activity more functionally, contending that state and private actors alike can perform the relevant care function.

Importantly, the activity giving rise to plaintiff's injuries is not a discretionary governmental function warranting immunity. To this point, Adams is instructive. In Adams, 973 A.2d at 544, we considered the public-duty doctrine's application in the context of the Emergency Food Assistance Program (TEFAP), a federally funded yet state-administered food distribution program. Specifically, the Rhode Island Department of Corrections selected the organizations to distribute federally sponsored food to the public. Id. Notably, TEFAP did not allow private persons or corporations to execute food receipt or distribution functions. Id. The plaintiff alleged that he became sick after consuming a program-distributed box of raisins. Id.

Despite the fact that TEFAP restricted its shipment to state agencies (excluding private individuals or corporations), this Court nonetheless imposed liability on the state. See Adams, 973 A.2d at 546. The Court reasoned, "While it is true that administration of a federally funded program could, potentially, be considered a governmental function, the actual government function at issue in this case—namely, the storage and distribution of food—is an activity that business entities and private persons can and do perform regularly." Id. (emphasis added). Further, we emphasized, "The plaintiff does not argue that his alleged injuries arose out of the

- 15 -

discretionary decisions of government agents in administering the TEFAP program; instead, his allegations concern the relatively commonplace task of storing and distributing foodstuffs." Id.

Similarly, here, the administration, operation, or maintenance (in a broad sense) of the Veterans Home is not at issue. Rather, the pertinent government function is resident-patient care. The plaintiff does not assert that her injuries stem from a discretionary decision of the Director of Human Services, such as a decision to admit or deny a resident. Instead, she asserts that the negligence of a nurse or housekeeper caused her injuries. Regardless of whether this incident occurred in the Veterans Home or a private nursing home, the underlying function at issue—resident-patient care—remains unchanged. Therefore, we will not disturb the trial justice's public-duty doctrine finding.

## B

### Statutory Tort Cap

Rhode Island operates under a general statutory-damage limitation applicable in tort cases asserted against the state. This limitation provides:

> "In any tort action against the state of Rhode Island or any political subdivision thereof, any damages recovered therein shall not exceed the sum of one hundred thousand dollars ($100,000); provided, however, that in all instances in which the state was engaged in a proprietary function in the commission of the tort, or in any situation whereby the state has agreed to indemnify the federal government or any agency thereof for any tort liability, the limitation on damages set forth in this section shall not apply."
> Section 9-31-2.

Thus, this Court recognizes that damages above $100,000 are permitted when the tort action stems from the state's "proprietary function." "Proprietary" functions are those "actions normally performed by private individuals." Graff v. Motta, 695 A.2d 486, 489 (R.I. 1997). Alternatively, this Court has defined a "proprietary function" as "one which is not 'so

- 16 -

intertwined with governing that the government is obligated to perform it only by its own agents or employees.'" Lepore v. Rhode Island Public Transit Authority, 524 A.2d 574, 575 (R.I. 1987) (quoting Xavier v. Cianci, 479 A.2d 1179, 1182 (R.I. 1984)).

This Court recognizes the somewhat murky nature of deciphering when the state executes a proprietary versus a governmental function. Yet, we do not read the above "proprietary function" articulations as inconsistent. Whether a function is so intermingled with governing, such that only government agents or employees can execute it, begs the question of whether nongovernmental employees or private persons can also perform the function. In both inquiries, this Court pinpoints the function at issue and examines whether it is so significantly tied to governing that private persons or entities could not possibly fulfill it.

In analyzing whether the statutory tort cap applied, the trial justice found that the Home's daily operations were not so intertwined with governing to require the state to solely utilize state employees in executing its functions. The trial justice noted that the Home contracted with private employment agencies (including plaintiff's employer) and a private company for cleaning services. She reasoned that the Home's CNAs routinely executed tasks that private employees similarly performed. The trial justice cited Lepore, noting numerous similarities between the Veterans Home and the Rhode Island Public Transit Authority (RIPTA). For instance, she noted that both entities are legislatively created, neither is self-sustaining or expected to generate pecuniary profits, and although both collect revenue, each also relies on government funds.[15] The trial justice also stated that, like RIPTA, the Home furthers important public policy purposes for many elderly Rhode Island residents.

---

[15] The trial justice made additional comparisons between the Home and RIPTA. She observed that, whereas RIPTA floats public bonds, the Veterans Home accepts private donations. Each entity's governing authority is established by its respective enabling statute; RIPTA is an

- 17 -

The state argues that the damages cap applies because Veterans Home maintenance is a governmental function. The state further asserts that the trial justice applied the improper test in analyzing the cap. Specifically, the state asserts that the trial justice incorrectly applied the public-duty doctrine standard in this context, concluding that "the CNAs * * * were performing tasks that privately employed CNAs routinely perform." The state asserts that the trial justice should have instead asked whether it "engaged in a proprietary function in the commission of the tort."

We deem the state's arguments unpersuasive. The trial justice correctly adopted plaintiff's argument, finding the statutory tort cap inapplicable based on the Veterans Home's performance of a proprietary function. While we acknowledge that similarities between the public-duty doctrine and statutory tort cap standards create overlap in the trial justice's analysis of each issue, we are satisfied that the trial justice properly framed the issue before her. To inquire whether private individuals routinely perform the function is synonymous with asking whether the Veterans Home, in commission of the tort, acted in a proprietary manner. The state's semantical assertion is unfounded.

Moreover, we are not persuaded by the state's broad assertion that the Veterans Home is a creature of statute and therefore is protected by the tort cap. In determining the applicability of the statutory tort cap, whether an entity is statutorily created is not germane to this analysis. See Housing Authority of Providence v. Oropeza, 713 A.2d 1262, 1263-64 (R.I. 1998) (framing "essential question" as whether an activity is governmental or proprietary in the context of city housing authority notwithstanding fact that the housing authority was created by statute). Rather, we focus on the particular function at issue to the tort's commission. Under the state's

---

instrumentality and "state political subdivision" whereas the Home's supervision and administration is bestowed upon a state department head, the Director of Human Services.

reasoning, it is hard to imagine a scenario in which the Veterans Home—or any statutorily organized state entity—could be held fully liable in tort. To accept the state's assertions would morph current jurisprudence into a cursory analysis whereby statutory organization alone is sufficient to limit the state's liability. Further, such a standard would effectively reincarnate common-law sovereign immunity.

In this context, we are mindful that certain entities exercise a "dual nature," and perform both governmental functions and proprietary functions. For example, in Rhode Island Student Loan Authority v. NELS, Inc., 550 A.2d 624, 627 (R.I. 1988), the Court "recognized that a governmental entity can exercise both governmental and proprietary functions." NELS, Inc., involved a contract dispute between the Rhode Island Student Loan Authority (RISLA), a government entity, and a Rhode Island corporation. Id. at 625-26. The Court noted that, despite its nature as a state entity, RISLA served both governmental and proprietary functions. Id. at 627. The Court reasoned that RISLA contracted NELS "to serve as a rather 'sophisticated' collection agency [that] could neither exercise discretion nor set policy in the performance of its duties." Id. The Court deemed the defendant's function—collecting student loan principal and interest and maintaining transaction records—proprietary based on the disconnect between these activities and RISLA's governance. See id. Similarly, in Parent v. Woonsocket Housing Authority, 87 R.I. 444, 143 A.2d 146 (1958), the Court recognized that city housing authorities "have a dual nature which partakes of a public as well as a private character. They function in an area which is public and governmental in character as well as in an area which is proprietary or private." Id. at 448, 143 A.2d at 148.

Here, the Veterans Home is capable of fulfilling both governmental and proprietary functions. The events giving rise to liability—the resident-care functions of CNAs, or

alternatively, contracted housekeepers—constitute proprietary functions. Under <u>Graff</u>, 695 A.2d at 489, which defines proprietary functions as "actions normally performed by private individuals," the functions that the Home CNAs and housekeepers performed are not confined to a state veterans home context. Rather, private nursing homes can—and do—perform analogous patient-care functions.

Moreover, CNA and housekeeper duties are not "so intertwined with governing that the government is obligated to perform it only by its own agents or employees." <u>Lepore</u>, 524 A.2d at 575 (quoting <u>Xavier</u>, 479 A.2d at 1182). Indeed, as the trial justice recognized, the Home utilized contracted workers to provide resident care. The plaintiff herself was a per diem contract nurse at the Home, and she worked a similar private-nursing-home position after she ceased employment at the Home. The underlying daily activities of Veterans Home nurses, CNAs, and housekeepers are not unique to the Home, or its statutory inception.

Further, that the Veterans Home performed a proprietary function in this instance is not to say that it is incapable of performing a governmental function. This Court can imagine a scenario involving the management and operation of the Veterans Home that would involve discretionary government decision-making, such as negligence flowing from the director's decision to admit or not admit a resident-patient. However, as this is a fact-intensive test, this Court examines the underlying activity or function at issue rather than the entity itself. Here, the underlying function is proprietary, and thus the trial justice correctly rejected the tort cap's application.

**Prejudgment Interest**

The state argues that the court erred in awarding approximately $250,000 in prejudgment interest against it. Moreover, it avers that, because plaintiff never requested interest, none should have been awarded.

The state cites <u>Andrade v. State</u>, 448 A.2d 1293 (R.I. 1982), positing that a waiver of sovereign immunity applies only to tort damages, and not prejudgment interest. In <u>Andrade</u>, the Court held the state liable for damages but not for prejudgment interest, reasoning that "interest" is separate and distinct from "damages." <u>Id.</u> at 1295-96. However, this Court has sculpted an exception to the general rule that prejudgment interest is not awarded against the state, which, similar to the statutory tort cap analysis, turns on the proprietary versus governmental function distinction. <u>See</u> <u>Lepore</u>, 524 A.2d at 575; <u>see</u> <u>also</u> <u>Webster v. Perrotta</u>, 774 A.2d 68, 82 (R.I. 2001) (noting that prejudgment interest award turns on whether "municipality acts in a proprietary or enterprise capacity"); <u>Housing Authority of Providence</u>, 713 A.2d at 1263 ("[I]t is well settled that neither the state nor its political subdivisions are so shielded [from prejudgment interest] when the function performed that gave rise to the tort liability was proprietary rather than governmental in nature.").

In <u>Lepore</u>, 524 A.2d at 574, the plaintiff brought suit against RIPTA, the state-operated public-transportation authority, for injuries sustained while riding a bus. The Court held that prejudgment interest attached to the judgment for personal injuries against RIPTA, reasoning that RIPTA engaged in a proprietary, rather than governmental, function. <u>Id.</u> at 575. Further, the Court explicitly noted that <u>Andrade's</u> holding did not apply, deeming the trial justice's prejudgment interest award appropriate. <u>Id.</u> Specifically, this Court in <u>Lepore</u> emphasized: "In

cases where the § 9-31-2 limitation on recovery applies, we have recognized that no prejudgment interest may be attached." Lepore, 524 A.2d at 575. The Court further declared:

> "Section 9-31-2 does not place a limit on the amount of damages recoverable in the instant action because the government is performing a proprietary function. As a result, our holding in Andrade does not apply to this situation. Because it appears from § 9-31-2 that the Legislature did not intend to limit recovery in cases wherein the state is performing a proprietary function, we believe that the trial justice appropriately awarded prejudgment interest in the case at bar." Lepore, 524 A.2d at 575. Here too, prejudgment interest was appropriate because the Veterans Home acted in a proprietary, rather than governmental, manner. As the statutory tort cap is inapplicable, the state, like any private person, is subject to prejudgment interest.

Alternatively, the state argues that plaintiff did not request that the trial justice award prejudgment interest, which therefore makes the award improper. The state's assertion in this respect similarly lacks merit. The relevant interest statute provides, in pertinent part:

> "(a) In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein." G.L. 1956 § 9-21-10.

"[W]hether [the plaintiff] specifically requested the interest by motion * * * [is] not relevant for the awarding of prejudgment interest pursuant to § 9-21-10. This [C]ourt has long held that the awarding of such interest is a ministerial act for the clerk of the court, not an issue to be decided by the court." Cardi Corp. v. State, 561 A.2d 384, 387 (R.I. 1989). "[O]nce the claim for damages has been 'duly reduced to judgment the addition of interest is peremptory.'" Id. (quoting Kastal v. Hickory House, Inc., 95 R.I. 366, 369, 187 A.2d 262, 264 (1963)). Here,

that plaintiff did not request prejudgment interest by motion has no bearing on whether interest was appropriate. Accordingly, the award of prejudgment interest was not erroneous.

**D**

**Motion for Judgment as a Matter of Law**

The state argues that the trial justice erred in her denial of the state's motion for judgment as a matter of law.[16] Primarily, the state argues that plaintiff's case relies on impermissible inference building in that plaintiff did not eliminate other possible causes of the spill. The state avers that because a third party with Room B-7 access may have caused the spill, a reasonable jury should not have been allowed to find that a CNA or housekeeper caused it, or that the liquid was present long enough to alert a CNA to its existence.

A review of the evidence reveals that plaintiff set forth legally sufficient evidence such that denial of the state's motion for judgment as a matter of law was appropriate. Specifically, the trial justice recalled plaintiff's statement that she fell on liquid, which she thought was housekeeping cleaning fluid. The trial justice further noted that housekeeping finished cleaning at 3 p.m. and left the Home by 3:30 p.m. She recalled that plaintiff fell around 4:45 to 5 p.m., more than an hour after housekeeping finished. She noted that many CNAs consistently testified that their responsibilities included patient-room and bathroom inspections about every two hours. The trial justice found that if the jury determined that housekeeping caused the spill, sufficient evidence demonstrated that the spill was present long enough for the CNAs to inspect, discover, and clean it.

The trial justice then recalled the testimony of Demello, the CNA who covered Room B-7 during the 8 a.m. to 4 p.m. shift. She noted that Demello testified: (1) patient-safety

---

[16] Although the state moved for a new trial, it does not challenge the trial justice's finding in this respect on appeal.

- 23 -

inspections were essential; (2) as a perfectionist, she conducted inspections at least every one-and-a-half hours; (3) one of the first things CNAs should do after starting a shift is check the patients, rooms, and bathrooms to ensure no spills or messes; (4) she was aware that discarding patient-bath water could cause spills; and (5) she visited Room B-7 frequently during her shift that day. The trial justice concluded that if the jury found housekeeping left the liquid, Demello could have discovered it through a reasonable inspection before her shift ended.

The trial justice also recalled the testimony of Morantus, the CNA who worked during plaintiff's shift, starting at 4 p.m. She recalled evidence that one B-7 resident remained in his room for dinner, which started around 4:30 p.m. She noted that if necessary or appropriate, CNAs washed patients bedside, and, in the process, discarded excess water in the toilet. The trial justice also noted the CNAs' high standard of care when washing patients and discarding water, which required avoiding spills or immediately cleaning up any spills. The trial justice emphasized that all CNAs detailed the paramount importance of cleaning up spills in executing their functions. She recalled that Morantus was in B-7 shortly before plaintiff fell and noted that circumstantial evidence supported the inference that he was present in B-7 to feed a resident dinner. The trial justice gleaned sufficient evidence that could lead the jury to infer that one of the CNAs left the liquid, failing to reasonably inspect the bathroom during their shift. Because sufficient evidence allowed the jury to reach a verdict in plaintiff's favor, the trial justice properly denied judgment as a matter of law.

### E

### Comparative-Negligence Instruction

The trial justice refused to instruct the jury on comparative negligence as she found that the state never articulated a clear comparative-negligence theory. The state asserts that this

refusal to instruct was erroneous. Below, the state struggled to communicate its reasoning in favor of a comparative-negligence instruction and later argued alternative comparative-negligence theories.[17] The state suggested that a comparative-negligence instruction was appropriate because plaintiff: (1) failed to supervise the CNAs; (2) failed to notify the CNAs; and alternatively (3) did not properly enter Room B-7 to administer medications. These alternative suggestions justify the trial justice's conclusion that a comparative-negligence instruction was not clearly articulated.

However, for the first time on appeal, the state posits a new theory, suggesting that the trial justice should have instructed on comparative negligence because the jury heard testimony that the plaintiff entered the bathroom before she turned on the light. "It is well settled [under our raise-or-waive rule] that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." State v. Bido, 941 A.2d 822, 828-29 (R.I. 2008) (citing Hydro–Manufacturing, Inc. v. Kayser–Roth Corp., 640 A.2d 950, 959 (R.I. 1994)). Because the state failed to sufficiently articulate its comparative-negligence theory at trial, and, for the first time, asserts a new theory on appeal, the raise-or-waive rule precludes our review.

---

[17] At trial, among other inartful assertions of comparative negligence, the following colloquy occurred:

> "The Court: But, what was the negligent conduct?
> "[The state]: I mean, it's really just that she had a duty of care. I don't think there's going to be a negligent -- I don't think there's going to be a comparative negligence -- I don't think it's going to rise to that, that she actually did something or failed to do something.
> " * * *
> "[The state]: It's -- I guess comparative negligence doesn't -- I understand the Court's concern. It doesn't rise to the level of comparative negligence or claim of comparative negligence. It more goes to her duty of care and her duty as a nurse assigned to this particular locale and ward and whether she performed her duties as she was required."

# IV

## Conclusion

For the reasons stated herein, we affirm the Superior Court's judgment.  The record shall be remanded to that tribunal.

**Robinson, J., dissenting.**  After a great deal of research and reflection and even soul-searching, I have concluded that I must dissent from the Court's thoughtful and well-written opinion.  I do so respectfully, but quite ardently.  The majority opinion is unquestionably the product of a conscientious attempt to apply this Court's precedent to the instant factual situation; however, I simply disagree with the legal conclusions reached by the majority.  It is my view that: (1) the $100,000 statutory tort cap (G.L. 1956 § 9-31-2) should apply; and (2) the award of prejudgment interest was inappropriate in the instant case.[1]

# I

## The Statutory Tort Cap

---

[1]    In writing this dissent, I have kept constantly in mind the following hauntingly perceptive observation of Judge Learned Hand at the conclusion of an opinion concerning the meaning of a particular federal statute:

> "When we ask what Congress 'intended,' usually there can be no answer, if what we mean is what any person or group of persons actually had in mind.  Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion.  He who supposes that he can be certain of the result is the least fitted for the attempt."
> United States v. Klinger, 199 F.2d 645, 648 (2d Cir. 1952).

Because the Court's opinion nicely describes Rhode Island's rejection of common law sovereign immunity and the legislative enactment of the Rhode Island Tort Claims Act (chapter 31 of title 9), it is not necessary for me to replow that ground. It is § 9-31-2 of that act,[2] the section which confines potential damages against a governmental defendant, that is the narrow focus of my dissent: I disagree with the majority that § 9-31-2 is inapplicable to this case.[3]

I begin by emphasizing that our precedents in this domain surely do not constitute a seamless rule of law—far from it! Indeed, as I shall seek to demonstrate, there are actually two quite different "lines" of cases from this Court with respect to the statutory tort cap issue. The majority has chosen to base its holding on one of those lines of cases, but I am firmly convinced that the instant case should be governed by the other line of cases.[4]

---

[2]  Although the majority opinion does provide the reader with the text of G.L. 1956 § 9-31-2, I nonetheless proceed to do the same in this footnote so that that statutory provision will be readily accessible for the reader grappling with the difficulties presented by this very complex and challenging case. That statute reads as follows:

> "In any tort action against the state of Rhode Island or any political subdivision thereof, any damages recovered therein shall not exceed the sum of one hundred thousand dollars ($100,000); provided, however, that in all instances in which the state was engaged in a proprietary function in the commission of the tort, or in any situation whereby the state has agreed to indemnify the federal government or any agency thereof for any tort liability, the limitation on damages set forth in this section shall not apply."
> Section 9-31-2.

[3]  In order to avoid any confusion, I note that "[t]he limitation on liability was $50,000 when * * * § 9-31-2 was first enacted by P.L. 1970, ch. 181, § 2, but it was increased to $100,000 by P.L. 1984, ch. 87, § 1." Graff v. Motta, 695 A.2d 486, 489 n.1 (R.I. 1997).

[4]  In view of the dilemma posed by the very inconsistent nature of our precedent with respect to the statutory tort cap, one inevitably recalls the following lines from one of Robert Frost's most quoted poems:

> "Two roads diverged in a wood, and I —
> I took the one less traveled by,

Preliminarily, I note that the issue at hand is one of statutory interpretation, and we review such issues in a de novo manner. Shine v. Moreau, 119 A.3d 1, 9 (R.I. 2015); Nunes v. Meadowbrook Development Co., 24 A.3d 539, 542 (R.I. 2011). I further note the principle that the plain meaning rule should control when we are confronted with clear statutory language. See State v. Oliveira, 882 A.2d 1097, 1110 (R.I. 2005) ("It is well settled that when the language of a statute is clear and unambiguous, [we] must interpret the statute literally and must give the words of the statute their plain and ordinary meanings.") (internal quotation marks omitted); see also Hough v. McKiernan, 108 A.3d 1030, 1035 (R.I. 2015). But I also bear in mind that we are required to resort to interpretive principles when we are confronted with statutory ambiguity. See Oliveira, 882 A.2d at 1110 ("[I]t is equally well established that, when confronted with statutory provisions that are unclear or ambiguous, this Court, as final arbiter of questions of statutory construction, will examine statutes in their entirety, and will glean the intent and purpose of the Legislature from a consideration of the entire statute, keeping in mind [the] nature, object, language and arrangement of the provisions to be construed.") (internal quotation marks omitted); see also State v. Briggs, 934 A.2d 811, 814 (R.I. 2007) ("[W]hen ambiguity renders construction of a statute necessary, it is incumbent upon us to determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes.") (internal quotation marks omitted); Blais v. Franklin, 31 R.I. 95, 105-06, 77 A. 172, 177 (1910); see generally In re Brown, 903 A.2d 147, 150 (R.I. 2006) ("When we determine the true import of statutory language, it is entirely proper for us to look to the sense and meaning fairly deducible from the context.") (internal quotation marks omitted).

---

And that has made all the difference."

Robert Frost, "The Road Not Taken," in A Little Treasury of Modern Poetry 137 (Oscar Williams ed., Charles Scribner's Sons 1952).

It is my view that § 9-31-2 is a model of clarity until one encounters the clause that begins with the word "provided" (which clause contains the exception from the statutory tort cap for "all instances in which the state was engaged in a proprietary function in the commission of the tort"). In other words, § 9-31-2 presents the reader with a provision that is starkly clear (the legislative desire that there be a cap on tort damage awards against government), which provision is immediately followed by another provision (the "proprietary function" exception) that is undefined and not reducible to a precise definition. As our two lines of cases reflect, the "proprietary function" term is one which "is fairly susceptible of two or more conflicting constructions." Newport Gas Light Co. v. Norberg, 114 R.I. 696, 699, 338 A.2d 536, 538 (1975). This is a situation where "the Legislature's failure to define the term more precisely creates an ambiguity. In these circumstances we must seek the intended meaning of the legislation by reference to all pertinent considerations." Id.

Throughout my weeks of mulling over this admittedly very difficult case, I have kept constantly in mind the General Assembly's unwavering insistence that there should be a specific monetary ceiling on damages awarded pursuant to successful tort actions against the state. In expressly acknowledging the General Assembly's clear public policy option in that regard, this Court has stated:

> "When the government acts in the same manner as a private individual, 'the only difference between the State of Rhode Island and other tort defendants is the [monetary] limitation on liability contained in § 9-31-2.' * * * This cap on damages * * * ensure[s] that the state is not crippled by excessive judgments." Catone v. Medberry, 555 A.2d 328, 334 (R.I. 1989) (quoting Laird v. Chrysler Corp., 460 A.2d 425, 429 (R.I. 1983)).

It is self-evident that the raison d'être of the statutory tort cap is to "protect[] the state's treasury against excessive claims." Barratt v. Burlingham, 492 A.2d 1219, 1225 (R.I. 1985) (Kelleher, J., concurring). I respectfully submit that that legislative concern about not saddling taxpayers with great fiscal burdens continues to be of enormous importance and should be constantly borne in mind in addressing the difficult legal issues that this case involves.[5]

The majority correctly notes that § 9-31-2 excepts from the reach of the statutory cap "all instances in which the state was engaged in a proprietary function in the commission of the tort * * *." The majority then focuses on certain opinions issued by this Court over the years which have sought to delineate what the General Assembly meant when it employed in that statute the undefined term "a proprietary function." Those decisions relied upon by the majority vary in their analytical clarity, but they generally tend to equate a proprietary function with one that can be performed by a non-governmental actor as readily as by a governmental actor. See, e.g., Housing Authority of the City of Providence v. Oropeza, 713 A.2d 1262, 1264 (R.I. 1998) ("[T]he function at issue here, namely, the providing of security within and by the housing authority is proprietary in nature."); Rhode Island Student Loan Authority v. NELS, Inc., 550 A.2d 624, 627 (R.I. 1988) ("NELS's essential function[s] * * * to collect the principal and interest on outstanding student loans and to maintain records on all transactions * * * are proprietary in nature."); Lepore v. Rhode Island Public Transit Authority, 524 A.2d 574, 575 (R.I. 1987) ("[W]e do not believe that maintaining a public-transportation authority is a function

---

[5]     See also Andrade v. State, 448 A.2d 1293 (R.I. 1982). Although the specific issue before the Court in Andrade was the availability vel non of prejudgment interest, the Court opted to speak more broadly about the Tort Claims Act, saying that said act "must be strictly construed and whatever right of recovery is to be ascertained against the state must be expressly mentioned * * *." Id. at 1294. I view that statement as reflective of a continuing judicial awareness that the Tort Claims Act is to be carefully cabined in accordance with the first clause of § 9-31-2. Subsequently, the Court quoted with approval that same language from Andrade in the case of Matarese v. Dunham, 689 A.2d 1057, 1058 (R.I. 1997).

that is so intertwined with governing that we will consider it a governmental function. Rather, we consider its operation proprietary in nature.").[6] Those cases focus on the particular activity being performed when the alleged tort was committed. In my judgment, such a focus is not rooted in the statutory language and constitutes an "Open Sesame" for enormous damage awards—whereas I am convinced that the legislative intent as expressed in the statute was to limit the amount of damage awards in the governmental tort context save only for the genuinely exceptional case where government engages in a "proprietary function."

By contrast, as I indicated at the outset, there is another line of cases that should not be overlooked. These cases focus not on the nature of the activity at issue but rather on whether or not the alleged tort was somehow related to the maintenance of a public building. See, e.g., Kuhl v. Perri, 706 A.2d 1328, 1329 (R.I. 1998) (mem.) ("[O]peration and * * * maintenance of a public school is a governmental function and not a proprietary one."); Matarese v. Dunham, 689 A.2d 1057, 1058 (R.I. 1997) ("Maintenance of government buildings is plainly a governmental function * * *."); Chakuroff v. Boyle, 667 A.2d 1256, 1258 (R.I. 1995) ("[T]he operation and the maintenance of a public school is a governmental function and not a proprietary one."); Custom Flight Systems of New England, Inc. v. State, 641 A.2d 1324, 1324 (R.I. 1994) (mem.) ("[R]unning a public airport is exclusively an activity performed by a public entity."); Saunders v. State, 446 A.2d 748, 751-52 (R.I. 1982) ("[The] maintenance of a correctional institution is a

---

[6] The opinion in Lepore v. Rhode Island Public Transit Authority, 524 A.2d 574 (R.I. 1987) in effect defines "proprietary function" as being "one which is not 'so intertwined with governing that the government is obligated to perform it only by its own agents or employees.'" Id. at 575 (quoting Xavier v. Cianci, 479 A.2d 1179, 1182 (R.I. 1984)). Notably, however, the quoted language from the Xavier case was articulated in the context of deciding "whether the mayor and the board can contract out the functions and duties of a city department that was created by the city charter and staffed and paid for in accordance with a duly enacted city ordinance." Xavier, 479 A.2d at 1181. The opinion in Xavier in no way dealt with the "proprietary function" exclusion in the statutory tort cap.

governmental function. Consequently, in the event that a correctional officer employed by the state was guilty of negligence and was not protected by personal immunity, the state would be liable under the doctrine of respondeat superior for the negligence of its employee subject to the monetary limitation set forth in § 9-31-2."). As I understand them, the just-cited cases indicate that the statutory tort cap (and not the proprietary function exception) should be applicable when the alleged tort is directly related to the maintenance of a public building. Accordingly, in view of the fact that the tort at issue unquestionably occurred in connection with the maintenance of a governmental building, I believe that these cases should control the instant case.[7]

I view this Court's opinion in the case of Matarese, 689 A.2d at 1057-58, to be particularly instructive and directly pertinent to the instant case. In Matarese, the Court was confronted with the following issue: whether a plaintiff who had been injured by a city-owned car driven by an employee of the City of Providence was entitled to prejudgment interest on the award of damages against the city (liability having been conceded). Id. There would be such an entitlement if driving the vehicle were held to be a proprietary function. However, the Court in Matarese held that, since the driver "was on twenty-four-hour call" with respect to the maintenance and operation of government buildings, he was performing a governmental function—and, therefore, the addition of prejudgment interest to the judgment against the city was barred. Id. at 1058. The Court in that opinion explicitly stated that the "[m]aintenance of government buildings is plainly a governmental function * * *."[8] Id. (emphasis added). The

---

[7] I would add that, in my judgment, the General Assembly's clearly expressed preference for finite monetary limitations in the domain of governmental tort liability calls for the application of the statutory tort cap in doubtful cases—although I do not believe that this case is in any way doubtful.

[8] It is important to note that, just like the plaintiff in the instant case, the plaintiff in Matarese "attempted to bring her case within the ambit of Lepore [524 A.2d at 575]," asserting that the "operation of a motor vehicle" was a "proprietary function" because that activity "might

breadth of that statement is noteworthy in that it is not in any way limited to the prejudgment interest context. Id. In the case at bar, the fact is that Ms. Roach was injured as a result of activities (allegedly conducted in a negligent manner) that related directly to the maintenance of the Veterans Home (incontestably a government building). Try as I might, I am unable to fathom why her situation is distinguishable from that of the plaintiff involved in Matarese or from that of the plaintiffs in the other cases that I have cited in the immediately preceding paragraph—all of which classify the maintenance of public buildings as a governmental function; for that reason, I do not believe that plaintiff's case should be exempted from the statutory tort cap.[9] I realize that, if plaintiff had been injured while working in a private nursing home or in a hotel, the amount of damages awarded to her would have been far less susceptible to legitimate challenge. But that is not what in fact happened in this case. I am firmly of the view that the Matarese line of cases clearly should control.[10] The General Assembly remains free to increase the dollar amount in the statutory tort cap or, indeed, to abolish that cap entirely and allow tort claims against government to be treated just like such claims against private persons or entities. But, absent such legislative action, I am convinced that the statutory tort cap should apply to this case.

---

just as easily be performed by a private person as by an agent of the municipality." Matarese, 689 A.2d at 1058. However, the Court in Matarese disagreed with that argument based on the fact that the city employee "was engaged in a governmental function [(viz., the maintenance of government buildings)] * * * when the accident occurred." Id.

[9] I concede that not all cases under the Tort Claims Act will be controlled by the rationale of the Matarese line of cases, which focuses on the maintenance of government buildings. However, I am convinced that that line of cases should control the case at bar; and, for me, that is sufficient for this day. See Grady v. Narragansett Electric Co., 962 A.2d 34, 41-42 n.4 (R.I. 2009) (referencing "our usual policy of not opining with respect to issues about which we need not opine").

[10] This Court is free to overrule the Matarese line of cases if it concludes that the reasoning in those cases is faulty. But unless and until that happens, it is my view that those cases should govern the analysis and the result in cases involving the maintenance of public buildings.

- 33 -

## II

## Prejudgment Interest

I am also of the opinion that the Superior Court erred in adding prejudgment interest to the award of damages. I would not deviate from the rationale of this Court's holding in Matarese, 689 A.2d at 1058. See Andrade v. State, 448 A.2d 1293, 1295 (R.I. 1982) (holding that prejudgment "interest is not an element of damages"); see also Andrade v. Perry, 863 A.2d 1272, 1275 (R.I. 2004); Mulvaney v. Napolitano, 671 A.2d 312, 313 (R.I. 1995) (mem.).

## III

## Conclusion

I do acknowledge that there is precedent upon which the majority could logically rely for its conclusion that the statutory tort cap should not apply in this case. But I am equally aware that there is also a line of cases applying the statutory tort cap to activities connected to the maintenance of public buildings. (One yearns for Occam's metaphorical razor to cut through this clash of authoritative precedents.) In view of the fact that the Veterans Home is incontestably a government building and that the tort at issue resulted from the allegedly negligent maintenance of that building as well as the General Assembly's clear desire that damages in tort actions against government should ordinarily be limited to a maximum of $100,000, I would hold that the statutory tort cap should apply to the instant case.

It is my opinion that the obvious goal of the General Assembly in enacting the Tort Claims Act was to allow some measure of relief to plaintiffs seeking relief for alleged governmental torts while also protecting taxpayers from having to be responsible for very large

awards of damages. With that in mind, I respectfully but earnestly submit that the scope of the "proprietary function" exception to the statutory tort cap cries out for definitive clarification by the General Assembly—lest the ever-beleaguered taxpayer be required to be responsible for very large awards of damages (such as those in the instant case) against a background of uncertainty as to the meaning of the "proprietary function" exclusion in the underlying statute.

For these several reasons, I respectfully dissent.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Victoria Roach v. State of Rhode Island et al. |
| **Case Number** | No. 2014-204-Appeal. (PC 09-4465) |
| **Date Opinion Filed** | April 18, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Patricia A. Hurst |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Brian R. Cunha, Esq.<br><br>For Defendants:<br><br>Michael W. Field<br>Department of Attorney General<br><br>Matthew I. Shaw<br>Department of Attorney General<br><br>Adam J. Sholes<br>Department of Attorney General |